[No. C032353. Third Dist. Aug. 11, 2000.]

MARTIE L. MAHER et al., Plaintiffs and Respondents, v.
SYLVIA B. SAAD, Defendant and Appellant.

COUNSEL

Leonard & Lyde and Sharon A. Stone for Defendant and Appellant.

Poswell & White, R. Parker White and Greg A. Meyer for Plaintiffs and Respondents.

OPINION

NICHOLSON, Acting P. J.—Defendant Sylvia B. Saad, M.D., appeals from the trial court's granting of plaintiffs' motion for new trial following a jury verdict in favor of defendant in an action alleging medical malpractice. For the reasons which follow, we affirm.

### PROCEDURAL BACKGROUND

By complaint filed April 16, 1997, plaintiffs Martie L. Maher and Sheldon Raymond Russell sought to recover damages from defendant and other parties for medical malpractice and loss of consortium arising from medical

treatment rendered to Maher. All other defendants were dismissed or awarded summary judgment.

Trial proceeded against defendant on November 30, 1998. On December 17, 1998, the jury returned a verdict in favor of defendant, and judgment was entered accordingly.

Plaintiffs subsequently filed a motion for new trial, and on February 10, 1999, the trial court granted plaintiffs' motion. It concluded the following errors prevented plaintiffs from receiving a fair trial: (1) it had improperly instructed the jury on "alternative methods of diagnosis and treatment" (BAJI No. 6.03); (2) defense counsel had submitted to the jury an unredacted letter from a defense expert in violation of a stipulation and order directing that a portion of the letter referencing defendant's standard of care be redacted; and (3) by referring to plaintiffs' expert witness as a "hired gun," defense counsel had violated a stipulation suggested by the court by which the parties agreed not to inquire of expert witnesses regarding how much money they were paid for their time and expertise.

The trial court thereafter denied defendant's motion for reconsideration. Defendant timely filed this appeal from the trial court's grant of the motion for new trial.

On appeal, defendant argues the trial court erroneously granted the motion for new trial for the following reasons: (1) the trial court ruled on the motion without first examining the "entire cause" (Cal. Const., art. XVI, § 13); (2) the trial court did not err by instructing the jury on "alternative methods of diagnosis and treatment" (BAJI No. 6.03); (3) defense counsel did not improperly submit into evidence the expert witness's unredacted letter; and (4) defense counsel's reference to plaintiffs' expert witness as a "hired gun" did not violate the court-requested stipulation.

We conclude (1) the record does not demonstrate the trial court failed to consider the "entire cause" when it ruled on the motion for new trial; and (2) the trial court did not abuse its discretion granting a new trial based on the erroneous reading of BAJI No. 6.03 to the jury. Because we affirm the trial court's order on these grounds, we need not address defendant's other assertions of error.

## FACTS

Defendant began treating then 37-year-old Maher for duodenal ulcer disease in November 1995. According to defendant's counsel, "[a] duodenal

ulcer is caused by the erosion of the healthy mucosa or surface of the duodenum by digestive juices. [The duodenum is the beginning portion of the small intestine, extending from the lower end of the stomach to the jejunum. (Webster's 2d New Riverside Univ. Dict. (1988) p. 410.)] The eroded area is painful, can bleed copiously, and in some cases will perforate through to the outside of the digestive tract."

Maher had a long history of peptic ulcer disease. This brought on numerous, and at times, daily episodes of gastrointestinal bleeding, pain, nausea and vomiting, including vomiting blood. Medication and a prior surgery to remedy the problem had failed. Defendant thus recommended Maher undergo an "antrectomy, with probable Billroth II reconstruction . . . ."

An antrectomy is the "[r]emoval of the antrum (distal [or lower] half) of the stomach . . . ." (Stedman's Medical Dict. (24th ed. 1982) p. 93.) Defendant's counsel further explains: "The Billroth II procedure is a surgical means of bypassing a recurrent ulcer in the upper digestive tract. The surgery involves the removal of the distal [lower] portion [of] the stomach and that portion of the duodenum containing the ulcer. If the duodenal stump [the portion of the duodenum not removed] can be mobilized to reach the transected portion of the stomach, the two are attached (anastomosed) end-to-end (Billroth I). Otherwise, the transected portion of the duodenum is closed into a stump, and the distal portion of the resected stomach is attached directly to the jejunum (Billroth II)."

On November 27, 1995, defendant performed an antrectomy and Billroth II procedure on Maher at the Feather River Hospital in Paradise, California. During the operation, defendant located a previously identified stricture, i.e., a narrowing, inside the first portion of the duodenum slightly beyond the ulcer site.[1] The stricture was roughly in the shape of a doughnut, and left an opening inside the duodenum of less than one centimeter in diameter, large enough, according to one of defendant's experts, to drain whatever may be behind it so long as the opening did not get any smaller.

Defendant believed she could not excise the duodenum below the stricture because that part of the duodenum is too closely associated with the blood flow and workings of the pancreas. She also believed it would not be good to cut above the stricture, as the stricture could continue narrowing and ultimately block all flows of bile and pancreatic juices from behind it. This could result in an overgrowth of bacteria in the duodenal stump and further

---

[1] A stricture is "an abnormal narrowing of a duct or passage." (Webster's II New Riverside Univ. Dict., *supra*, p. 1147.) A stricture is usually caused by contraction of scar tissue or deposits of other abnormal tissue. (Stedman's Medical Dict., *supra*, p. 1351.)

infections, as well as the creation of pressure, a condition known as a blind loop syndrome, that could blow out the stump's closure.

Defendant decided to make a lateral cut on the front of the duodenum above the stricture. Then she made a longitudinal cut down through the stricture. She then closed this "T" incision in a "single ellipse," resulting in the severed ends of the stricture being included in the suture line used to close the duodenal stump. Defendant then removed Maher's lower stomach and first portion of her duodenum, and connected Maher's remaining stomach to her jejunum.

Defendant believed cutting through the stricture and including the stricture in the stump's suture line would stop the stricture from closing into an obstruction, prevent pooling of bodily fluids between the stricture and the end of the duodenal stump, and prevent other long-term adverse effects.

Maher's postoperative recovery went well, and she was discharged on December 4, 1995.

Shortly thereafter, Maher began suffering recurrent vomiting and abdominal pain, and was readmitted to the hospital on January 17, 1996. On January 18, 1996, defendant performed an exploratory laparotomy and drained infected fluid from Maher's abdominal cavity. Defendant found no evidence of a leak from Maher's digestive tract where the Billroth II had been performed. During this surgery, Maher suffered a cardiac arrest, but was successfully revived.

By January of 1996, Maher's wound from the incision was leaking "bilious" fluid, and was beginning to form into a fistula. Defendant again surgically explored Maher's abdomen on January 24, 1996, and this time discovered a leak in the suture line of Maher's duodenal stump that had been sewn closed as part of the Billroth II procedure. Defendant inserted a tube into the stump and sutured the duodenal wall around the tube. She also inserted drains around the duodenum.

Notwithstanding these measures, the duodenal stump continued to leak. To prevent additional drainage from the stump into Maher's abdominal cavity, defendant on February 1, 1996, created a wide opening or wound in Maher's skin (a fistula) that would allow the stump to drain outside the body.

Despite these efforts, Maher continued to suffer nausea, vomiting, malnutrition, renal failure, and internal infections, among other problems. The

fistula also continued to drain and not close on its own. As a result, defendant transferred Maher to the University of California, Davis, Medical Center in Sacramento for care. Maher was treated and released, but significant problems continued, necessitating further hospital admissions. Ultimately, on August 9, 1996, Dr. Bruce M. Wolfe at U.C. Davis Medical Center performed surgery resulting in the successful closure of the leaking duodenal stump and the leaking fistula. Maher, however, continued to suffer serious health problems.

Maher and her husband, plaintiff Russell, filed this action against defendant. Plaintiffs in particular alleged defendant committed malpractice by the manner in which defendant closed the duodenal stump. Plaintiffs sought a total of $1,056,231 in general and special damages and lost wages. Plaintiffs submitted no damage figure for the alleged loss of consortium. Following trial, the jury returned a verdict in favor of defendant by a vote of 11 to 1. The trial court thereafter granted plaintiffs' motion for new trial, which defendant now challenges here.

DISCUSSION

I

*Standard of Review*

"On appeal from an order granting a new trial the order shall be affirmed if it should have been granted upon any ground stated in the motion, whether or not specified in the order or specification of reasons . . . ." (Code Civ. Proc., § 657.) ■ " 'On appeal from an order granting a new trial, the sole question is whether the trial court abused its discretion. . . . This court makes all presumptions in favor of the order as against the verdict, and this court will reverse only if manifest abuse of discretion is shown.' " (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 205 [48 Cal.Rptr.2d 448], citations omitted, quoting *Hand Electronics, Inc. v. Snowline Joint Unified School Dist.* (1994) 21 Cal.App.4th 862, 871 [26 Cal.Rptr.2d 446].)

Although generally a new trial order will be affirmed if it should have been granted on any ground stated in the notice of intention, where "a trial court in granting a new trial based its order exclusively upon an erroneous concept of legal principles applicable to the cause, its order will be reversed." (*Conner v. Southern Pacific Co.* (1952) 38 Cal.2d 633, 637 [241 P.2d 535].)

## II

### *Trial Court's Examination of "Entire Cause"*

■ Defendant initially claims the trial court abused its discretion by ruling on the motion for new trial without examining the whole record, in violation of the state Constitution.[2] Because the trial record had only been partially transcribed when the court heard the motion, defendant argues the trial court could not have examined the "entire cause," as constitutionally required, before ruling on the motion. We disagree.

The authority cited by defendant explains why we disagree with defendant's argument: "This [constitutional] provision is a limitation on the power of the trial court, but when that court has acted and granted a new trial, we must *presume* that the trial court did consider the whole record and decided that it had committed prejudicial error, and unless an inspection of the record convinces us that it is otherwise, we will not disturb the order." (*Pitt v. Southern Pacific Co.* (1932) 121 Cal.App. 228, 238 [9 P.2d 273], italics added; see also *Barber v. Quatacker* (1938) 29 Cal.App.2d 728, 731 [85 P.2d 560].)

The trial judge may not have been able to read the entire transcript, but he presided over the entire eight-day trial. He ruled on the motion less than two months after entry of judgment. Based upon our review of the record, we cannot conclude as a matter of law the trial court failed to conduct "an examination of the entire cause" when it determined the motion for new trial.

## III

### *Trial Court's Giving BAJI No. 6.03 to Jury*

■ The trial court granted the motion for new trial in part because it concluded it had given BAJI No. 6.03 in error. Defendant claims the trial

---

[2]Article VI, section 13 of the California Constitution provides: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

court correctly gave No. 6.03 and the motion for new trial should not have been granted on this basis. We disagree.

Over plaintiffs' objection, the court gave to the jury BAJI No. 6.03. That instruction reads: "Where there is more than one recognized method of diagnosis or treatment, and no one of them is used exclusively and uniformly by all practitioners of good standing, a physician is not negligent if, in exercising her best judgment, she selects one of the approved methods, which later turns out to be a wrong selection, or one not favored by certain other practitioners."

Plaintiffs sought to prove defendant's treatment fell below the standard of care by, among other things, her using the so-called "T" incision through the stricture and then including the ends of the stricture in the duodenal stump's suture line during the Billroth II procedure. In their motion for new trial, plaintiffs argued use of the "T" incision in this circumstance was not a recognized or approved method of treatment and the jury instruction prevented plaintiffs from receiving a fair trial on their negligence claim.

■ "The grant of a new trial is a proper remedy for the giving of an erroneous jury instruction when the improper instruction materially affected the substantial rights of the aggrieved party. (Code Civ. Proc., § 657.) . . . 'When a new trial was granted on the basis of an erroneous instruction, the order "will not be disturbed unless the questioned instruction was absolutely accurate and under no reasonable interpretation could possibly have misled or confused the jury. . . ." . . .' " (*Caldwell v. Paramount Unified School Dist., supra,* 41 Cal.App.4th at p. 205, quoting *Hand Electronics, Inc. v. Snowline Joint Unified School Dist., supra,* 21 Cal.App.4th at p. 871.)

■ The issue before us is not whether the "T" incision was, in a generic sense, an approved method of treatment. At oral argument, counsel for defendant claimed BAJI No. 6.03 was appropriate because the "T" incision was one of many recognized arrows in the surgeon's quiver, and the jury instruction applied whether or not the particular treatment was appropriate for use in the particular situation.

We disagree with this contention. BAJI No. 6.03 calls for the use of a "recognized" and "approved" method of diagnosis or treatment. A method can be found to be "recognized" and "approved" only in relation to the condition of the patient. What may be an "approved" method in one situation might not be under other circumstances.

Nor is the issue before us whether defendant's use of the "T" incision violated the standard of care she owed. A jury not instructed with BAJI No. 6.03 still could have found defendant's use of the technique satisfied the standard of care. However, if the technique was not approved or recognized for this circumstance, BAJI No. 6.03 inappropriately removed the issue of standard of care away from the jury and denied plaintiffs an opportunity to prove the standard of care was violated.

Defendant's expert witnesses testified they believed defendant's use of the "T" incision satisfied the standard of care. None of them, however, testified her use of the "T" incision was an approved or recognized method of treatment for closing a duodenal stump in a Billroth II operation.

Dr. Robert C. Lim, Jr., a professor of medicine at the University of California, San Francisco, referred to the "T" incision as essentially a sphincteroplasty, where a sphincter, in this case, the stricture, is cut and opened to make the opening through it wider. He testified the technique "is used whenever we have a tight band in any part of the intestine, especially in the small bowel . . . ." Dr. Lim stated "this procedure is not foreign to this area, . . ." and gave an example of how it is used to open the sphincter between the stomach and the duodenum.

However, the issue was use of the "T" incision not simply to open the stricture, but as a method of closing the duodenal stump. Although the use of the "T" incision was not foreign to opening strictures in the small intestine, Lim testified in his more than 30 years of experience at a major surgical center he had never before performed a "T" incision to close a duodenal stump, nor had he seen a "T" incision used to close a duodenal stump. In fact, he had never read of using the "T" incision to close a duodenal stump in his review of medical literature.

When asked how he would respond if he saw one of his students close a duodenal stump using the "T" incision, Lim responded: "I wouldn't be critical of it. I would say that it is *pretty innovative*, because I think that is one way to handle it, *but it is not the usual way of handling it*." (Italics added.) Lim never testified using a "T" incision was an approved or recognized method of treatment to close a duodenal stump.

Dr. John Floyd, a retired surgeon also with more than 30 years of experience, including the performance of the Billroth II procedure, testified the "T" incision was "a standard method of working with the small bowel,

usually used to increase the diameter of the lumen of the bowel to attribute [attach] to another structure, such as sewing the small bowel to the colon after a portion of the colon is removed. There is a reference to this in that textbook on surgical technique, which is Shackelford's [S]urgery, and it does show the use of the fish mouthing of the duodenum to be used to suture it to the stomach to increase the diameter of the bowel and increase the diameter of the anastomosis, the opening."

However, on cross-examination, Floyd admitted Shackelford's reference to the technique was with regard to performing a Billroth I, where the duodenum end is opened and attached to the stomach. In this case, Maher received a Billroth II, where the stomach was attached to the jejunum, leaving behind the duodenal stump that needed to be closed, not opened and attached to something else. Floyd admitted defendant's use of the "T" incision to close the stump in a Billroth II was not depicted in Shackelford's. Floyd also admitted he had never used the "T" incision to close a duodenal stump.

Defendant herself testified she had never seen a "T" incision described in any text as a method for closing a duodenal stump. She stated she had never been taught a "T" incision was a proper method for closing a duodenal stump. She also testified she had never closed a duodenal stump in this manner before this occasion.

Based on this evidentiary showing, we cannot determine as a matter of law BAJI No. 6.03 was absolutely correct and could not possibly have misled the jury. There was no testimony at trial demonstrating defendant's use of the "T" incision was a recognized method of treatment for closing a duodenal stump. The instruction could have misled the jurors into believing the "T" incision was an approved method for closing a duodenal stump, and they were thus foreclosed from considering the issue of standard of care. The evidence indicates the instruction should not have been given, and the jury should have determined whether use of the "T" incision satisfied the standard of care free of the prescription imposed by BAJI No. 6.03.

We thus conclude the trial court did not abuse its broad discretion in granting the motion for new trial. Since we must affirm the trial court's order upon finding one ground in support thereof, we do not address defendant's other contentions.

## DISPOSITION

The order of the trial court granting plaintiffs' motion for new trial is affirmed. Plaintiffs are awarded their costs on appeal.[3]

Morrison, J., and Callahan, J., concurred.

A petition for a rehearing was denied September 7, 2000, and appellant's petition for review by the Supreme Court was denied November 29, 2000.

---

[3]Plaintiff Martie Maher died on February 7, 1999, after judgment had been entered. We found no substitution of parties in the record. Counsel for plaintiffs provided us with an order for probate filed June 17, 1999, appointing plaintiff Sheldon Russell as special administrator for Maher with the power and authority to take all actions required to continue the prosecution of this case. On a showing of death, the decedent's administrator is entitled to be substituted as a party to the action. (*Pepper v. Superior Court* (1977) 76 Cal.App.3d 252, 260 [142 Cal.Rptr. 759].) Because Maher's administrator was already a party to this action, and because we affirm the trial court's order granting a new trial, neither defendant nor plaintiff Russell has suffered any prejudice or harm due to the lack of a formal substitution. While the failure to substitute earlier is "merely a procedural irregularity" (4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 238, p. 299), it nonetheless will require corrective action before retrial proceeds.