[No. B193104. Second Dist., Div. Three. Mar. 14, 2008.]

YAHAIRA AYALA, a Minor, etc., et al., Plaintiffs and Appellants, v. ARROYO VISTA FAMILY HEALTH CENTER, Defendant and Respondent.

**COUNSEL**

Agnew & Brusavich, Gerald E. Agnew, Jr., Lawrence D. Marks; Esner, Chang & Ellis, Stuart B. Esner and Gregory R. Ellis for Plaintiffs and Appellants.

Cole Pedroza, Curtis A. Cole, Kenneth R. Pedroza; Carroll, Kelley, Trotter, Franzen & McKenna, Richard D. Carroll and David P. Pruett for Defendant and Respondent.

**OPINION**

**KLEIN, P. J.**—Plaintiffs and appellants Yahaira Ayala (Ayala), a minor, by and through her guardian ad litem and mother, Rita Rios (Rios), and Rios individually (collectively, plaintiffs), appeal a judgment in favor of defendant and respondent Arroyo Vista Family Health Center (Arroyo) following a defense verdict in a medical malpractice action.

Plaintiffs' theory of malpractice is that Arroyo was negligent in failing to test Ayala to determine whether she was suffering from hyperglycemia and as a consequence, Ayala fell into a diabetic coma and suffered permanent brain injury.

The essential issue presented on appeal is whether the trial court committed prejudicial instructional error by instructing the jury pursuant to Judicial Council of California Civil Jury Instruction (2006) CACI No. 506.[1] This case requires us to address the circumstances under which it is appropriate to give said instruction.

---

[1] CACI No. 506, Alternative Methods of Care, provides: "A [*insert type of medical practitioner*] *is not necessarily negligent* just because [he/she] chooses one medically accepted method of treatment or diagnosis and it turns out that another medically accepted method would have been a better choice." (Second italics added.)

The BAJI version, BAJI No. 6.03, Alternative Methods of Diagnosis or Treatment, states: "Where there is more than one recognized method of diagnosis or treatment, and no one of

■ We conclude that in order for CACI No. 506 to be given, there must have been expert testimony presented to the jury to the effect that a medical practitioner chose a medically accepted method of diagnosis (or treatment) from among alternative medically accepted methods of diagnosis (or treatment).

In this case, the defense presented expert testimony that Ayala's health care providers acted within the standard of care, even though they failed to diagnose Ayala's hyperglycemia. However, the defense did not present any evidence that the method used to diagnose Ayala's condition, namely, a medical history and physical examination, was one of a number of approved or recognized methods of diagnosing a patient with Ayala's history and symptoms. Therefore, CACI No. 506, the alternative method of diagnosis or treatment instruction, should not have been given.

We also conclude that on this record, the giving of CACI No. 506, although erroneous, was nonprejudicial. Therefore, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

1. *Facts.*

Ayala, born in August 1996, was a patient of Arroyo since she was three weeks old.

On April 2, 2001, Ayala, who was then about four and a half years old, was seen at Arroyo for a physical with Dr. Ramos. Her chart noted chronic obesity and a family history of diabetes. Dr. Ramos recommended dietary changes and increased exercise.

On December 28, 2002, Ayala returned to Arroyo, where she was seen by Dr. Goldberg with a cough and flulike symptoms. She then weighed 80 pounds.

them is used exclusively and uniformly by all practitioners of good standing, under the same or similar circumstances, a physician is not negligent if, in exercising [his] [or] [her] best judgment, [he] [or] [she] selects one of the approved methods, which later turns out to be a wrong selection, or one not favored by certain other practitioners."

[2] Because the reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable (*Freeze v. Lost Isle Partners* (2002) 96 Cal.App.4th 45, 53 [116 Cal.Rptr.2d 520]), we view the evidence in the light most favorable to Arroyo to determine whether the giving of CACI No. 506 was appropriate.

Some two weeks later, on January 15, 2003, Ayala again went to Arroyo with complaints of headaches, which were waking her up at night. A nurse weighed Ayala and noted she weighed 78 pounds, a two-pound loss from her previous visit. This was the first time Ayala had a loss of weight from one visit to the next. Dr. Owyang performed a full neurological examination to rule out any serious problems. He diagnosed Ayala with headaches, prescribed Motrin and advised Ayala's mother, Rios, to take Ayala to the clinic or the emergency room immediately if Ayala experienced any focal weakness, in which one side of the body does not work properly with the other side, or if there were any loss of consciousness, seizures or worsening symptoms.

Less than one month later, on February 10, 2003, Ayala returned to Arroyo with fever, vomiting, diarrhea, congestion and cough.[3]

At the February 10, 2003 visit, Ayala's blood pressure went from elevated at the January 15 visit (110/80) to low (72/52), and she now weighed 72 pounds (a loss of eight pounds).

Based on her presenting symptoms, Dr. Luetkehans concluded Ayala had a viral illness. He ascribed both her upper respiratory symptoms and her stomach symptoms to that virus. He prescribed Motrin and a prescription syrup for Ayala. Ayala and Rios left the clinic at 3:00 p.m. Rios had the prescriptions filled at the adjacent pharmacy and went home with Ayala.

That evening, Ayala's condition worsened. At 1:03 in the morning, Rios called the paramedics. They arrived five minutes later. David Raya, one of the paramedics, found Ayala in her parents' bed, unresponsive. He tried to assess her level of consciousness and found her to have a Glasgow coma scale of 1-1-1, which is as low as one can go. Raya used a glucometer to check Ayala's blood sugar and found her blood sugar was above 400, which means the patient "is having . . . a diabetic coma or a diabetic ketoacidosis." Ayala was transported to Huntington Memorial Hospital for treatment.

Ayala's initial presentation at the hospital was type 2 diabetes. She subsequently became insulin dependent, was found to have "antibodies to the pancreas" and is now considered type 1 diabetic.

---

[3] Rios presented inconsistent testimony as to Ayala's symptoms. At trial, Rios testified she told Dr. Luetkehans on February 10, 2003, that Ayala was "drinking a lot of water and she was urinating a lot." However, according to Rios's deposition testimony, which was read to the jury, Rios did not observe Ayala was more thirsty than normal, or that she urinated more frequently on February 9, 2003, and that the *only two reasons* Rios took Ayala to the doctor on February 10 were fever and vomiting.

The diabetic coma caused significant and permanent brain injury. Although Ayala has a life expectancy of an additional 71 years, it is unlikely she will ever reach higher than the moderately retarded range, which means she could attain the age of a three or four year old in some of her functioning, but her judgment and aggression when she is thwarted is actually worse than that, so she would not even be functioning as a normal three or four year old.

## 2. *Proceedings.*

On May 6, 2004, plaintiffs filed suit against Arroyo and Dr. Luetkehans for medical negligence based on the failure to diagnose and treat Ayala for hyperglycemia.

On May 5, 2006, the matter came on for a jury trial. There was conflicting testimony as to the nature of Ayala's symptoms (see fn. 3, *ante*), and whether the standard of care required Dr. Luetkehans to test Ayala for hyperglycemia.

### a. *Plaintiffs' expert testimony.*

Dr. Suparna Jain, a pediatric endocrinologist, testified weight loss is a classic clinical presentation of hyperglycemia. Other symptoms of hyperglycemia can include increased urination, increased thirst, dehydration, increased appetite, headaches, lethargy and fatigue, difficulty in concentration, infections and blurry vision.

Dr. Jain opined the diabetic coma could have been prevented had Ayala been duly diagnosed and treated. "At the time [Ayala] was in the clinic [at 3:00 p.m.], she was certainly hyperglycemic. She was exhibiting increased urination and increased thirst and she was diabetic." According to Dr. Jain, Dr. Luetkehans's diagnosis of a viral illness was "incomplete" and was unreasonable under the circumstances. There was no notation of dehydration as a diagnosis and there was no testing for hyperglycemia. The "standard of care required in this situation with a child with a [family] history of diabetes, with chronic morbid obesity, who is losing weight now rapidly over a short period of time," was that "[h]yperglycemia should have been looked at."

### b. *Defense expert testimony.*

Dr. Chavis, a board certified pediatrician, testified as to her opinions regarding the care rendered to Ayala.

According to Dr. Chavis, when Ayala was examined on April 2, 2001, based solely on the fact she was obese and that her maternal grandmother had type 2 diabetes, the standard of care did not require three-month screening labs to determine whether she was prediabetic. Guidelines do not call for diabetes screening for children under the age of 10. Further, she was unaware of any guideline for a six-year-old child that recommends screening for diabetes on a quarterly basis. Just because a patient is obese does not mean the patient will have diabetes. Only 5 to 13 percent of obese children might develop diabetes after the age of 10.

Dr. Chavis further opined that on January 15, 2003, Dr. Owyang also acted within the standard of care. When presented with a history of headaches, one of which woke her up at night, and photophobia, a reasonable and prudent physician would perform a physical examination to determine whether there was an acute process (such as an intracranial bleed or aneurysm) or a chronic process (such as a migraine headache). Dr. Owyang performed a physical exam, ruled out any acute process, diagnosed Ayala as having headaches, prescribed Motrin and directed a return to the clinic if there were focal weakness.[4]

Further, the two-pound weight loss from December 28 to January 15 should not have been a cause of concern for Dr. Owyang. A weight loss of two pounds in a child weighing 80 pounds, and who also came in with a three-day history of headaches, did not require Dr. Owyang to inquire into the potential for hyperglycemia.

Finally, with respect to the February 10, 2003 visit, Dr. Chavis opined Dr. Luetkehans met the standard of care. Ayala presented with cough, congestion, diarrhea, fever and vital signs that were all consistent in February (flu season) with upper respiratory tract infection, gastroenteritis, and viral illness. Dr. Luetkehans was not required by the standard of care to inquire further into Ayala's weight loss, which was attributable to the vomiting and diarrhea. Further, Dr. Luetkehans did not need to worry about dehydration because Ayala was not listless, lethargic or unarousable, as a physician would expect if a child were 10 percent dehydrated.

Finally, Dr. Chavis opined the fact Ayala was hyperglycemic is not determinative of negligence. A physician can miss a diagnosis such as this without acting below the standard of care.

---

[4] Dr. Jain disagreed with Dr. Chavis as to the adequacy of Dr. Owyang's evaluation of Ayala on January 15, 2003. According to Dr. Jain, Ayala should have had a CT scan of the head or a referral to a neurologist.

c. *The giving of CACI No. 506.*

The defense requested the jury be instructed pursuant to CACI No. 506, the alternative methods of diagnosis and treatment instruction. The defense argued that "[t]here was testimony from both of the standard of care experts that there were various methods and means by which diagnosis could be pursued and by which treatment could be provided, and so that is an appropriate instruction under the circumstances of this case and the testimony we received from both of those witnesses."

Plaintiffs opposed this instruction, contending it was improper because there was no effort made by defendants to diagnose or treat Ayala's hyperglycemia.

The trial court ruled the instruction was "marginal" but allowed it to be given, stating, "it is within the scope of the evidence."

Accordingly, pursuant to CACI No. 506, the trial court gave the following instruction: "A pediatrician is not necessarily negligent just because he or she chooses one medically accepted method of treatment or diagnosis and it turns out that another medically accepted method would have been a better choice."[5]

d. *Defense verdict and subsequent proceedings.*

The jury returned a defense verdict by a vote of nine to four, the parties having stipulated that an alternate juror could vote as well. The jury determined Arroyo was not "negligent in the diagnosis or treatment of [Ayala]."

Plaintiffs moved for a new trial, contending, inter alia, the trial court committed prejudicial instructional error in giving CACI No. 506.

The trial court denied the motion for new trial, explaining: "the arguments were raised by the defendant that there were alternative treatments or alternative diagnoses and there was some evidence to support the defendant's claim with regard to alternative treatments or diagnoses."

Plaintiffs filed a timely notice of appeal from the judgment.[6]

---

[5] Other relevant instructions will be set forth in the Discussion portion of the opinion.

[6] On October 24, 2007, the parties filed a stipulation dismissing the appeal as to Dr. Luetkehans. The stipulation states Dr. Luetkehans was dismissed from this case prior to trial and his inclusion in the appeal was inadvertent. Thus, Arroyo is the sole respondent on appeal.

## CONTENTIONS

Plaintiffs contend that because this case was not about the method of diagnosis or treatment of Ayala's condition, the trial court prejudicially erred in instructing the jury pursuant to CACI No. 506, the alternative method of medical diagnosis or treatment instruction.

## DISCUSSION

*Trial court erred in giving CACI No. 506 because the instruction was not supported by the evidence.*

    a.  *Standard of review.*

■ " '[P]arties have the "right to have the jury instructed as to the law applicable to all their theories of the case which were supported by the pleadings and the evidence, whether or not that evidence was considered persuasive by the trial court." [Citation.] *"A reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable* since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented. [Citation.]" [Citation.]' [Citation.]" (*Freeze v. Lost Isle Partners, supra,* 96 Cal.App.4th at pp. 52–53, italics added.) Therefore, we view the evidence in the light most favorable to Arroyo to determine whether it was entitled to the giving of CACI No. 506. (96 Cal.App.4th at pp. 52–53.)

    b.  *CACI No. 506 requires an evidentiary showing that a medical practitioner chose a medically accepted alternative method of diagnosis or treatment.*

To reiterate, CACI No. 506, the alternative methods of care instruction, provides: "A [*insert type of medical practitioner*] is not necessarily negligent just because [he/she] chooses *one medically accepted method of treatment or diagnosis* and it turns out that *another medically accepted method* would have been a better choice." (Second and third italics added.)

There is a dearth of authority on when it is appropriate to instruct the jury on medically accepted alternative methods of *diagnosis*. However, *Maher v. Saad* (2000) 82 Cal.App.4th 1317 [99 Cal.Rptr.2d 213] (*Maher*), which

involved BAJI No. 6.03 and addressed the circumstances in which it is appropriate to instruct on medically accepted alternative methods of *treatment*, is instructive.

In *Maher*, the defendant physician's expert witnesses testified they believed the defendant's use of a surgical method known as a "T" incision satisfied the standard of care. (*Maher, supra*, 82 Cal.App.4th at p. 1326.) *"None of them, however, testified [defendant's] use of the 'T' incision was an approved or recognized method of treatment for closing a duodenal stump in a Billroth II operation."* (*Ibid.*, italics added.)

Based on this evidentiary showing, it was error to give the alternative methods of diagnosis and treatment instruction. (*Maher, supra*, 82 Cal.App.4th at pp. 1326–1327.) *Maher* explained: *"There was no testimony at trial demonstrating defendant's use of the 'T' incision was a recognized method of treatment for closing a duodenal stump.* The instruction could have misled the jurors into believing the 'T' incision was an approved method for closing a duodenal stump, and they were thus foreclosed from considering the issue of standard of care. The evidence indicates the instruction should not have been given, and the jury should have determined whether use of the 'T' incision satisfied the standard of care free of the prescription imposed by BAJI No. 6.03." (*Id.* at p. 1327, italics added.)

c. *In the absence of expert testimony that a medical history and physical examination was a medically accepted alternative method of diagnosing a patient with Ayala's history and symptoms, CACI No. 506 was inapplicable and should not have been given.*

Plaintiffs contend that in this case, CACI No. 506 should not have been given because Arroyo did not use *any* method to diagnose or treat Ayala's *hyperglycemia*. According to plaintiffs, because Arroyo did not employ a blood test, urinalysis or other diagnostic method to diagnose Ayala's hyperglycemia, Arroyo was not entitled to the giving of CACI No. 506.

Plaintiffs, by focusing on laboratory tests and on the ultimate diagnosis of diabetes, frame the issue too narrowly. The proper inquiry is whether the defense presented expert testimony to the effect that there were medically

accepted alternative methods of diagnosing a patient with Ayala's medical history and symptoms and that Arroyo utilized a medically accepted alternative method, namely, a medical history and physical examination of Ayala, so as to entitle the defense to the giving of CACI No. 506.

Our review of the evidence presented to the jury reveals there was extensive defense expert testimony to the effect that Arroyo's assessment and treatment of Ayala met the standard of care, so as to entitle the jury to find that Arroyo's diagnosis and treatment of Ayala satisfied the standard of care, in accordance with the basic standard of care instruction, CACI No. 501.[7] However, there was no expert testimony to the effect that a medical history and physical examination is a medically accepted alternative method of diagnosing a patient with Ayala's history and symptoms, so as to support the giving of CACI No. 506.

For example, with respect to whether the standard of care required an assessment by Dr. Ramos to determine whether Ayala already was prediabetic on April 2, 2001, Dr. Chavis testified there was no violation of the standard of care on that date, and that Dr. Ramos properly counseled behavioral and dietary changes at that time. Similarly, as to whether the standard of care required a referral to a neurologist or a CT scan on January 15, 2003, Dr. Chavis opined the standard of care did not require referring Ayala to a neurologist or a CT scan.

As to whether the standard of care required a workup for hyperglycemia on February 10, 2003, Dr. Chavis opined the standard of care did not require a workup for hyperglycemia on that date. Dr. Chavis found no indication that Dr. Luetkehans was advised on that date that "there ha[d] been a lot of urination or excessive thirst or hunger with weight loss." Dr. Chavis explained Dr. Luetkehans "made a diagnosis that he thought [Ayala] had an upper respiratory tract infection. He thought that she had a viral illness, that she had associated acute gastroenteritis." The "diagnosis of gastroenteritis in a patient with this exact presentation of coughing, congestion, vomiting, diarrhea, history of a tactile fever, weight loss, and these vitals signs" was "an appropriate, understandable, reasonable diagnosis under these circumstances." Dr. Chavis also observed the February 10, 2003 visit was in the middle of the winter flu season.

---

[7] Pursuant to CACI No. 501, the basic standard of care instruction, the trial court instructed on the standard of care for health care professionals as follows: "A pediatrician is negligent if he or she fails to use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful pediatricians would use in similar circumstances. This level of skill, knowledge, and care is sometimes referred to as the standard of care."

As for the eight-pound weight loss since December 28, 2002, Dr. Chavis noted the family had been counseled about weight loss and some of the weight loss could be due to dietary changes. The weight loss was also explained by Ayala's vomiting and diarrhea, consistent with the diagnosis of an upper respiratory tract infection and acute gastroenteritis, but there were no signs of significant dehydration. Based on all these circumstances, Dr. Chavis opined Arroyo's failure to do a urinalysis or a glucometer study on February 10, 2003, was not below the standard of care.

In sum, this evidentiary showing that Arroyo met the standard of care owed to Ayala warranted the giving of CACI No. 501. However, merely because CACI No. 501 was applicable does not mean that CACI No. 506 also was applicable. CACI No. 506 provides a medical practitioner "is not necessarily negligent just because [he/she] chooses *one medically accepted method of treatment or diagnosis* and it turns out that *another medically accepted method* would have been a better choice." (Italics added.) In the absence of expert testimony that a medical history and physical examination was a medically accepted alternative method of diagnosing a patient with Ayala's history and symptoms, CACI No. 506 was inapplicable and should not have been given.

   d.   *On this record, the giving of CACI No. 506, although erroneous, was nonprejudicial.*

We conclude the instructional error was harmless because it is not reasonably probable plaintiffs would have obtained a more favorable result in its absence. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570 [34 Cal.Rptr.2d 607, 882 P.2d 298]; see Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)

"In assessing prejudice from an erroneous instruction, we consider, *insofar as relevant*, '(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) *the effect of other instructions in remedying the error* [citations].' [Citation.]" (*Soule v. General Motors Corp., supra,* 8 Cal.4th at pp. 570–571, italics added.)

Plaintiffs contend CACI No. 506 "allow[ed] the jury to avoid resolving the key issue in this case: did the standard of care require defendants to use a method to attempt to diagnose hyperglycemia. . . . [T]*he instruction simply allowed the jury to conclude that because there were divergent expert*

*opinions on this issue there was no malpractice.*" (Italics added.) The contention is without merit. The instructions required the jury to evaluate all the expert testimony to determine whether the standard of care required Arroyo to evaluate Ayala for hyperglycemia.

The trial court instructed the jury to "consider all of the instructions together," and that not all the instructions were necessarily applicable.

The jury further was advised, "You do not have to accept an expert's opinion. As with any other witness, it is up to you to decide whether you believe the expert's testimony and choose to use it as a basis for your decision. You may believe all, part, or none of an expert's opinion."

With respect to the standard of care, the jury was instructed: "A pediatrician is negligent if he or she fails to use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful pediatricians would use in similar circumstances. This level of skill, knowledge, and care is sometimes referred to as the standard of care."

The jury was further instructed that a "pediatrician *is not necessarily negligent just because his or her efforts are unsuccessful or he or she makes an error that was reasonable under the circumstances.* A pediatrician is negligent only if he or she was not as skillful, knowledgeable, or careful as other reasonable pediatricians would have been in similar circumstances." (Italics added.)

After that came the CACI No. 506 instruction, to wit: "A pediatrician is not necessarily negligent just because he or she chooses one medically accepted method of treatment or diagnosis and it turns out that another medically accepted method would have been a better choice."

■ In view of the other instructions which were given, we reject plaintiffs' contention the giving of CACI No. 506 allowed the jury to conclude that merely because the experts disagreed as to whether Ayala should have been tested for hyperglycemia, there was no malpractice. Presented with these instructions, the only way this jury could have reached a defense verdict was by finding more credible the defense expert testimony that the standard of care did not require a workup of Ayala for hyperglycemia.

Therefore, the giving of CACI No. 506, although erroneous, was harmless on this record.

## DISPOSITION

The judgment is affirmed. The parties shall bear their respective costs on appeal.

Kitching, J., and Aldrich, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 9, 2008, S162944. Moreno, J., did not participate therein.