[No. A126937. First Dist., Div. Two. Jan. 10, 2012.]

PAMELA MIZE-KURZMAN, Plaintiff and Appellant, v.
MARIN COMMUNITY COLLEGE DISTRICT et al., Defendants and
Respondents.

COUNSEL

Horowitz & Rubinoff, Martin M. Horowitz and Stephanie Rubinoff for Plaintiff and Appellant.

Law Offices of Larry Frierson and Larry Frierson for Defendants and Respondents.

OPINION

KLINE, P. J.—

## INTRODUCTION

Plaintiff Pamela Mize-Kurzman appeals from a judgment in favor of defendants Marin Community College District and its board of trustees (collectively, district), following a jury trial on her claims that the district was liable under two California "whistleblower" protection statutes, Labor Code section 1102.5 and Education Code section 87160 et seq. Plaintiff contends the trial court committed reversible error in jury instructions it gave that were patterned upon federal law; that the errors were compounded by erroneous answers to the jury's questions; that the court unduly pressured the jury to return a verdict; and that the court committed reversible error when it allowed the district to present evidence of plaintiff's retirement pension on the issue of her mitigation of damages and instructed the jury that it could determine whether such retirement pension should reduce any damages. We shall conclude that three of the court's instructions were erroneous and require reversal and remand for a new trial.

## FACTS AND PROCEDURAL BACKGROUND[1]

Plaintiff has been employed by the district since July 1, 1973. From 1981 through June 30, 2007, she was employed as an administrator. She was promoted to dean of enrollment services in 1994, pursuant to the settlement of a previous lawsuit against the district. (The dean was an "at will"

---

[1] Because plaintiff primarily complains of instructional error, we recite the facts in the light most favorable to the claim of instructional error (see *Ayala v. Arroyo Vista Family Health Center* (2008) 160 Cal.App.4th 1350, 1358 [73 Cal.Rptr.3d 486]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2010) ¶ 8:120, pp. 8-75 to 8-76 (rev. # 1, 2009)) and we assume the jury might have believed appellant's version of the facts on which it was misdirected (*Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 674 [117 Cal.Rptr. 1, 527 P.2d 353]; *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 674 [11 Cal.Rptr.3d 807]; Eisenberg et al., ¶ 8:120, p. 8-76).

position.) In July 2004, Frances White became the superintendent and president of the district. Plaintiff was one of several vice-presidents and deans who reported directly to White. In January 2005, in addition to plaintiff's regular duties as dean of enrollment services, development and special programs, White assigned plaintiff the duties of the recently vacated position of dean of student development and special services. Plaintiff was also appointed to act as interim dean for social and behavioral sciences. On January 29, 2006, Anita Martinez was hired as the vice-president of student learning and was plaintiff's direct supervisor.

## A. Alleged Disclosures

Beginning in April 2006, plaintiff made four claimed disclosures of what she believed to be violations of law or regulations to various individuals and entities:

**1. Alleged tampering with the hiring process.** In April 2006, plaintiff reported to White her concerns that there had been an interference in the hiring process for the position of director of student support services and English as a second language (ESL). Plaintiff was on the interview committee that was to recommend candidates to White. The committee met and unanimously recommended one candidate. The human resources clerk immediately made a call and then informed the committee that the "President" wanted it to recommend an additional candidate, and the committee did so. The human resources clerk then told the committee that the "President" wanted three candidates from which to choose. The committee refused to recommend a third candidate. After the committee made its recommendation of two candidates, plaintiff sought out White, who was not on campus. Plaintiff realized the human resources clerk had been talking to Martinez and not to White. Plaintiff met with Martinez and told her what had happened in the committee. Martinez was visibly angry and told plaintiff that Martinez wanted a specific person for the position. On April 8, 2006, plaintiff sent an e-mail to White, stating that the committee had "the strong opinion that the job was being set up for a specific candidate." Although plaintiff did not advise White that she thought the interference by Martinez was illegal, she believed White would know this because White's Web site contained an Education Code section stating jobs could not be promised to someone and that the process was required to be fair and open. Plaintiff testified that she viewed Martinez's apparent effort to include a particular person as a finalist as "tampering with the process." She believed Martinez's interference was a violation of the Education Code and she wanted to warn White.

**2. La Academia grant.** Also in April 2006, plaintiff reported to Martinez and White that she believed certain provisions of the La Academia Project in

the Educational Excellence Innovation Fund (EEIF) proposal for the 2006–2007 school year, were unconstitutional in targeting scholarship moneys to Hispanic students. Plaintiff had no involvement with the EEIF program, which was unrelated to her department. Plaintiff had heard that the EEIF proposal granted scholarships from district funds for Latino students only. (White, who had created the EEIF at the College of Marin, testified that was not in fact the case.) Plaintiff was concerned this might be an illegal use of public funds "to fund a specific ethnic group or provide services for a specific ethnic group." She checked with the district's outside legal counsel (colloquially referred to as "Bob Henry's office"), and was given general advice that "the Latino student scholarship fund violates the California Constitution if it awards scholarships derived from public funds to students based solely upon their ethnicity or national origin."

On April 10, 2006, plaintiff sent an e-mail to White, copying Martinez and others, incorporating the response from outside legal counsel that "A Latino student scholarship fund violates the law if it awards scholarships derived from public funds to students based solely upon their ethnicity or national origin," and stating she had confirmed this with Bob Henry's office. Martinez at some point met with the grant proposer and pointed out that publicly funded programs, including the EEIF, could not discriminate against students and that the grant had to be rewritten so that it would serve all qualified and eligible students. The grant was revised to take out the singular reference to Latinos. White testified that she told plaintiff the EEIF was not for scholarships. Martinez testified she already knew about these types of programs, that what plaintiff said about the unlawfulness of using state money in targeted scholarships was accurate, but that Martinez did not need to see a legal opinion about it. Martinez verbally ordered plaintiff not to contact outside counsel without checking with her first.

**3. *Registration without payment of fee.*** In July and August 2006, plaintiff told Martinez that she believed the district's new policy of allowing students who owed fees to register even if they had outstanding unpaid fees, and also without paying the then current registration fee, was illegal. Plaintiff based her assertion on information she had received in the past from Bob Henry's office and from the chancellor's office. She also conducted an Internet survey on a "list-serv" of colleagues on this issue. On August 24, 2006, plaintiff sent an e-mail to Martinez raising the issue of the legality of the directive. By late August, White knew plaintiff was questioning whether it was appropriate for the district to register students who owed fees to the college. Plaintiff testified she was "fairly certain" the policy directive from Martinez violated the Education Code. She believed there was a significant risk of liability to the district that could result in penalties upon the college. On September 19, 2006, plaintiff reviewed a legal opinion on the chancellor's office Web site and sent an e-mail to Ralph Black, counsel for the chancellor's office, on the

topic. Plaintiff received a response from Black, citing an opinion of the chancellor's office on October 26, 2006, and forwarded it to Martinez, who shared it with White. White knew of this opinion that the district should not allow indefinite deferral of fees. At trial, the legal experts for the parties disagreed as to whether a community college was required to deny enrollment to students who owed money.

**4. *Citizenship inquiries.*** In February 2006, Martinez had directed plaintiff to remove questions asking students to provide citizenship and residency information from the credit class application for admission. Based on information she had received from Bob Henry's office and the chancellor's office over the years, plaintiff told Martinez she believed the policy was illegal. In March, Martinez made statements at a meeting of the college's management council that plaintiff attended, stating that the college did not have to ask for citizenship information on the noncredit application. In connection with this directive, plaintiff inquired of Black of the chancellor's office whether student residency information should be retained for noncredit students. In March 2007, plaintiff informed Martinez that the information was a legally required element of data collected by the California Community Colleges Chancellor's Office. At trial, the parties' experts disagreed as to whether community college districts were required to classify every student, including those enrolling exclusively in noncredit classes, as either residents or nonresidents.

## B. Asserted Retaliation

Following plaintiff's April 10, 2006 e-mail to White and others stating that she believed the La Academia Project violated the California Constitution, White responded to her that the EEIF was "not for scholarships." A trail of e-mails ensued and on April 11, 2006, Martinez directed plaintiff in writing "per my last email, could you please delay further inquiry until we discuss how best to proceed." On April 11, 2006, White directed plaintiff to "please stop the email discussion." Martinez directed plaintiff that she "should not call Bob Henry's office," because the district's legal expenses "were getting high." (Martinez testified she directed plaintiff not to contact any legal counsel—and did not limit the prohibition to Bob Henry's office.)

In July 2006, plaintiff discovered via an organizational chart that the district had reorganized her position, changing her title to dean of enrollment services, and taking away a significant number of her duties including her membership in the academic standards committee, which she considered one of the most important elements of her job, as it involved policymaking and ensuring the district complied with education laws. She considered this a demotion.

In the fall of 2006, White implemented a new policy restricting contact with outside counsel. She directed that deans and directors should not contact attorneys without prior approval.

Plaintiff sent Martinez an e-mail on October 30, 2006, alleging Martinez had directed her to do "something illegal" by allowing students to register with outstanding debts and that this could expose the district to a large monetary penalty. In response, Martinez issued four written orders to plaintiff, reprimanding her for seeking a legal counsel opinion from the chancellor's office in violation of Martinez's previous directive and for attempting "to cast [herself] in the role of a whistleblower." Martinez ordered plaintiff to speak with Martinez first, in the event she believed some action the college had taken or would take was impermissible, illegal or fiscally unsound and that Martinez would request a legal opinion or advice and/or speak with the cabinet. Second, plaintiff was to seek Martinez's permission before circulating questions or participating in any e-mail discussion on any official community college list-servs on any topic related to the legality or permissibility of college actions. Third, she was to provide Martinez a copy of any correspondence she undertook on behalf of the college regarding general policy or practice, especially if questions of legality or permissibility could arise. Fourth, she was not to contact legal counsel in the chancellor's office, unless she had gone through the administrative process, including receiving Martinez's express permission. Failure to comply with the directives would "be seen as insubordination."

Plaintiff disputed Martinez's imposition of discipline as unwarranted. Martinez responded that "a further response from you will be deemed an act of insubordination."

At the last regular board meeting before the March 15, 2007 deadline to give notice of removal to an administrator, upon the recommendations of White and Martinez, the board released plaintiff from her administrative assignment and placed her on immediate paid administrative leave. Earlier that day, White and Martinez had signed a negative performance evaluation of plaintiff. Plaintiff was not shown the evaluation on that date, although she testified she had been available. Because plaintiff had tenure rights in the district, she was reassigned to a counselor position with the district. She was serving in that position at the time of trial.

Plaintiff filed her initial complaint on July 19, 2007, and a first amended complaint on January 16, 2008. The court dismissed four of plaintiff's causes of action and the case proceeded to trial on three causes of action alleging violations of Labor Code section 1102.5, subdivisions (a) and (b) and

violation of Education Code section 87160 et seq. On September 8, 2009, plaintiff dismissed her Education Code claim against individual defendants White and Martinez.

The jury deliberated from September 9 through 11, 2009. It found against plaintiff on all three of her claims. This timely appeal followed.

## DISCUSSION

### I. Instructions

The court gave two special instructions explaining the requirements for whistleblower claims under the Labor Code and Education Code sections at issue. Plaintiff contends special jury instructions Nos. 2 and 3 contained five federally based limitations on what constituted "disclosures" that were inapplicable to her California "whistleblower" claims under Labor Code section 1102.5, subdivision (b)[2] and Education Code sections 87160 through 87164.[3] She further contends that even if federal law provided applicable standards, the instructions given were erroneous interpretations of the federal law.

Plaintiff challenges that portion of special instruction No. 2 regarding violation of Labor Code section 1102.5, subdivision (b) that read: "Plaintiff

---

[2] Labor Code section 1102.5 provides: "(a) An employer may not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

"(b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

"(c) An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

"(d) An employer may not retaliate against an employee for having exercised his or her rights under subdivision (a), (b), or (c) in any former employment.

"(e) A report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b).

"(f) In addition to other penalties, an employer that is a corporation or limited liability company is liable for a civil penalty not exceeding ten thousand dollars ($10,000) for each violation of this section.

"(g) This section does not apply to rules, regulations, or policies which implement, or to actions by employers against employees who violate, the confidentiality of the lawyer-client privilege of Article 3 (commencing with Section 950), the physician-patient privilege of Article 6 (commencing with Section 990) of Chapter 4 of Division 8 of the Evidence Code, or trade secret information."

[3] Education Code section 87162, subdivision (e) provides in relevant part: "(e) 'Protected disclosure' means a good faith communication that discloses or demonstrates an intention to

must prove that any disclosure of information was made in good faith and for the public good and not for personal reasons. Debatable differences of opinion concerning policy matters are not disclosures of information within the meaning of paragraph 1. Information passed along to a supervisor in the normal course of duties is not a disclosure of information within the meaning of paragraph 1. Reporting publicly known facts is not a disclosure of information within the meaning of paragraph 1. Efforts to determine if a practice violates the law are not disclosures of information within the meaning of paragraph 1."

Similarly, plaintiff contends the court erroneously included the following paragraph in special instruction No. 3 regarding retaliation for whistleblowing in violation of Education Code section 87160 et seq.: "A 'protected disclosure' means a good faith communication that discloses or demonstrates an intention to disclose information that may evidence an improper governmental activity. In that regard, Plaintiff must prove that any disclosure was made in good faith and for the public good and not for personal reasons. Debatable differences of opinion concerning policy matters are not protected disclosures. Information passed along to a supervisor in the normal course of duties is not a protected disclosure. Reporting publicly known facts is not a protected disclosure. Efforts to determine if a practice violates the law are not protected disclosures."

A. *Standards of Review*

" 'The propriety of jury instructions is a question of law that we review de novo. [Citation.]' (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82 [89 Cal.Rptr.3d 34].)" (*Ted Jacob Engineering Group, Inc. v. The Ratcliff Architects* (2010) 187 Cal.App.4th 945, 961 [114 Cal.Rptr.3d 644].) Where it is contended that the trial judge gave an erroneous instruction, we view the evidence in the light most favorable to the claim of instructional error. (*Ayala v. Arroyo Vista Family Health Center, supra*, 160 Cal.App.4th at p. 1358; Eisenberg et al., Cal. Practice Guide: Civil

disclose information that may evidence either of the following: [¶] (1) An improper governmental activity. [¶] (2) Any condition that may significantly threaten the health or safety of employees or the public if the disclosure or intention to disclose was made for the purpose of remedying that condition."

"Improper governmental activity" is defined in subdivision (c) of that statute as: "an activity by a community college or by an employee that is undertaken in the performance of the employee's official duties, whether or not that activity is within the scope of his or her employment, and that meets either of the following descriptions: [¶] (1) The activity violates a state or federal law or regulation, including, but not limited to, corruption, malfeasance, bribery, theft of government property, fraudulent claims, fraud, coercion, conversion, malicious prosecution, misuse of government property, or willful omission to perform duty. [¶] (2) The activity is economically wasteful or involves gross misconduct, incompetency, or inefficiency." (Ed. Code, § 87162, subd. (c).)

Appeals and Writs, *supra*, ¶ 8:120, pp. 8-75 to 8-76.) In other words, we assume the jury might have believed the evidence favorable to the appellant and rendered a verdict in appellant's favor on those issues as to which it was misdirected. (*Henderson v. Harnischfeger Corp., supra*, 12 Cal.3d at p. 674; *Whiteley v. Philip Morris, Inc., supra*, 117 Cal.App.4th at p. 655; Eisenberg et al., ¶ 8:120, p. 8-76.)

" 'That is not to say, however, that a failure properly to instruct a jury is necessarily or inherently prejudicial.' [Citation.]" (*Whiteley v. Philip Morris, Inc., supra*, 117 Cal.App.4th at p. 655.) "In *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*), the California Supreme Court definitively held, '[T]here is no rule of automatic reversal or "inherent" prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) . . . [¶] Instructional error in a civil case is prejudicial "where it seems probable" that the error "prejudicially affected the verdict." [Citations.]' (*Soule*, at p. 580.)" (*Ted Jacob Engineering Group, Inc. v. The Ratcliff Architects, supra*, 187 Cal.App.4th at p. 961.)

B. *Federally Based Limitations on What Constitutes a Disclosure Protected Under the California Statutes Incorporated into Special Jury Instructions Nos. 2 and 3*

In explaining its decision to include the federally based limitations in its special instructions Nos. 2 and 3, the court acknowledged the absence of CACI jury instructions on what constitutes "disclosing information" (Lab. Code, § 1102.5, subd. (b)) or a "protected disclosure" (Ed. Code, § 87162, subd. (e)) and the dearth of California law on the subject. The court recognized it was not bound by federal decisions interpreting the federal "whistleblower" statutes, but found it "not inappropriate . . . to consider them on similar subject matter, particularly where a California statute is based on a [f]ederal statute." The court concluded that the Education Code statute was modeled on the federal whistleblower protection act (WPA) (Whistleblower Protection Act of 1989, Pub.L. No. 101-12 (Apr. 10, 1989) 103 Stat. 16). Acknowledging the "linkage as to the Labor Code provision is not so obvious," the court, nevertheless, found no indication that the California Legislature intended the terms "disclosing information" (Lab. Code, § 1102.5, subd. (b)) and "protected disclosure" (Ed. Code, § 87162, subd. (e)) to have different meanings in those statutes. Finally, the court observed that "it would be a disservice to the jury not to tell them, based on well reasoned and . . . pertinent [f]ederal authority" what does *not* constitute "disclosing information" or "protected disclosure." "In my view, to do otherwise would be a

disservice to the jury, and would not be in keeping with the mandate of Rule of Court 2.1050 [s]ubdivision (e)."

As the court recognized, California Rules of Court, rule 2.1050(e) provides in relevant part: "[w]henever the latest edition of the Judicial Council jury instructions does not contain an instruction on a subject on which the trial judge determines that the jury should be instructed, or when a Judicial Council instruction cannot be modified to submit the issue properly, the instruction given on that subject should be accurate, brief, understandable, impartial, and free from argument."

As a general proposition, we conclude the court could properly craft instructions in conformity with law developed in federal cases interpreting the federal whistleblower statute. As the court acknowledged, it was not bound by such federal interpretations. Nevertheless, the court could properly conclude that the jury required guidance as to what did and did not constitute "disclosing information" or a "protected disclosure" under the California statutes.

The legislative history of the Education Code sections at issue leaves no doubt that they were intended to extend "whistleblower" protections of the California Whistleblower Protection Act (Gov. Code, § 8547 et seq.; California WPA) that apply to state employees, to public school and community college employees. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2472 (1999–2000 Reg. Sess.) as amended May 26, 2000, pp. 3, 7.) The California WPA, in turn, was "intended to align state 'whistleblower' statutes with those in existing federal law." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business of Sen. Bill No. 951 (1999–2000 Reg. Sess.) as amended Aug. 30, 1999, p. 4.) Contrary to plaintiff's suggestion that the "entire foundation" for the district's argument that the California WPA was based on the federal WPA was "one remark in a 1999 Senate Rules Committee analysis of a proposed amendment to the C[alifornia] WPA," virtually every analysis of that bill (Sen. Bill No. 951) stated that the "sponsor contends that this bill is intended to align state 'whistleblower' statutes with those in existing federal law." (Sen. 3d reading analysis of Sen. Bill No. 951 (1999–2000 Reg. Sess.) as amended Aug. 30, 1999, p. 2; Assem. Com. on Public Employees, Retirement and Social Security, Analysis of Sen. Bill No. 951 (1999–2000 Reg. Sess.) as amended May 26, 1999, p. 2; see Assem. Com. on Appropriations, Analysis of Sen. Bill No. 951 (1999–2000 Reg. Sess.) as amended July 15, 1999, p. 2; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 951 (1999–2000 Reg. Sess.) Apr. 28, 1999, p. 3; Sen. Com. on Public Employment and Retirement, Analysis of Sen. Bill No. 951 (1999–2000 Reg. Sess.) Apr. 12, 1999, p. 3.) In fact, the April 12, 1999 analysis of the Senate Committee on Public Employment and Retirement

states the subject matter/title of Senate Bill No. 951 as: "STATE EMPLOY-EES: 'WHISTLEBLOWER' PROTECTION ENHANCEMENTS: *ALIGN-MENT WITH FEDERAL 'WHISTLEBLOWER' STATUTES.*" (Italics added, underscoring omitted.)

Moreover, nothing in the legislative history of the pertinent statutes or the case authorities indicates that the terms "disclosing information" and "a disclosure of information" in Labor Code section 1102.5 and "protected disclosure" in Education Code section 87162 were intended to have significantly different meanings. No particular definition of "disclosing information" or "disclosure of information" is provided in Labor Code section 1102.5. However, pursuant to subdivision (b) of that statute, the disclosure protected under section 1102.5 is one that is made "to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (Lab. Code, § 1102.5, subd. (b).) Education Code section 87162 defines " '[p]rotected disclosure' " as "a good faith communication that discloses or demonstrates an intention to disclose information that may evidence either of the following: [¶] (1) An improper governmental activity. [¶] (2) Any condition that may significantly threaten the health or safety of employees or the public if the disclosure or intention to disclose was made for the purpose of remedying that condition." (Ed. Code, § 87162, subd. (e).)

■ Although the language of the federal WPA describing the conduct protected under that act (5 U.S.C. § 2302(b)(8)(A))[4] and conferring an individual right of action on the employee (5 U.S.C. § 1221(e)),[5] is not the same as used in the California statutes, the language and purpose of the statutes are

---

[4] Title 5 United States Code section 2302(b)(8)(A), part of the federal WPA, provides in relevant part:

"(b) Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority— [¶] . . . [¶]

"(8) take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of—

"(A) any *disclosure of information* by an employee or applicant which the employee or applicant reasonably believes evidences—

"(i) a violation of any law, rule, or regulation, or

"(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety,

"if such disclosure is not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs . . . ." (Italics added.)

[5] Title 5 United States Code section 1221(e) provides:

"(e)(1) Subject to the provisions of paragraph (2), in any case involving an alleged prohibited personnel practice as described under section 2302(b)(8), the Board shall order such corrective action as the Board considers appropriate if the employee, former employee, or applicant for employment has demonstrated that a disclosure described under section 2302(b)(8)

sufficiently close to permit the court to use federal authorities as a guide to interpretation of these California whistleblower protection statutes.[6]

Further, the California Supreme Court has noted in interpreting provisions of the California WPA that although the Legislature did not adopt language identical to that of the federal WPA, "it did create a somewhat similar structure." (*Runyon v. Board of Trustees of California State University* (2010) 48 Cal.4th 760, 772, fn. 7 [108 Cal.Rptr.3d 557, 229 P.3d 985] [interpreting Gov. Code, § 8547.12].)

We conclude the trial court could properly include in its jury instructions language further defining (and limiting) the disclosures protected under California law as "whistleblowing" in accord with federal cases interpreting the parallel federal WPA. We turn to the question whether the limiting instructions given by the court provided accurate statements of the law.

C. *The Five Instructional Limitations on What Constitutes a Disclosure Protected Under the California Statutes*

The five federally based limitations provided by the court in its special instructions Nos. 2 and 3 and challenged here stated: (1) Plaintiff must prove that any disclosure was made in good faith and for the public good and not for personal reasons. (2) Debatable differences of opinion concerning policy matters are not protected disclosures. (3) Information passed along to a supervisor in the normal course of duties is not a protected disclosure. (4) Reporting publicly known facts is not a protected disclosure. (5) Efforts to determine if a practice violates the law are not protected disclosures.

was a contributing factor in the personnel action which was taken or is to be taken against such employee, former employee, or applicant. The employee may demonstrate that the disclosure was a contributing factor in the personnel action through circumstantial evidence, such as evidence that—

"(A) the official taking the personnel action knew of the disclosure; and

"(B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action.

"(2) Corrective action under paragraph (1) may not be ordered if the agency demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure."

[6] "The Whistleblower Protection Act of 1989, Pub.L. No. 101-12, 103 Stat. 16 (1989), was created to improve protection from reprisal for federal employees who disclose, or 'blow the whistle' on, government mismanagement, wrongdoing, or fraud. S.Rep. No. 413, 100th Cong., 2d Sess. 1 (1988); 5 U.S.C. § 1201 note (Supp.1990). Congress thought such improved protection desirable because whistleblowers serve the public interest by assisting in the elimination of fraud, waste, abuse, corruption, and unnecessary government expenditures. 5 U.S.C. § 1201 note (Supp.1990)." (*Knollenberg v. Merit Systems Protection Bd.* (Fed.Cir. 1992) 953 F.2d 623, 625.)

### (1) *Plaintiff Must Prove That Any Disclosure Was Made in Good Faith and for the Public Good and Not for Personal Reasons*

■ This sentence of the special instructions misstated the applicable law. As explained in a leading California employment law treatise: "[A] whistle-blower's motivation is irrelevant to the consideration of whether his or her activity is protected. Whistleblowing may be prompted by an employee's dissatisfaction, resentment over unfair treatment, vindictiveness, or litigious-ness as well as by honest efforts to ensure that the employer is following the law. As long as the employee can voice a reasonable suspicion that a violation of a constitutional, statutory, or regulatory provision has occurred, the employee's report to a government agency may be sufficient to create liability for the employer for retaliation." (2 Advising Cal. Employers and Employees (Cont.Ed.Bar 2011 supp.) Whistleblower Issues, § 16.7, p. 1677.)

The district relied upon two cases it contended supported the limitation: *Garcetti v. Ceballos* (2006) 547 U.S. 410 [164 L.Ed.2d 689, 126 S.Ct. 1951] and *Fiorillo v. U.S. Dept. of Justice, Bureau of Prisons* (Fed.Cir. 1986) 795 F.2d 1544 *(Fiorillo)*, overruled by statute as stated in *Horton v. Department of the Navy* (Fed.Cir. 1995) 66 F.3d 279, 282–283 *(Horton)*. The first does not contain the limitation. The second has been expressly overruled by Congress, and criticized as misinterpreting the federal statute.

■ In *Garcetti v. Ceballos, supra*, 547 U.S. 410, the Supreme Court held that when public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer disci-pline. *(Garcetti*, at p. 425.) The Supreme Court did not limit the reach of whistleblower statutes to statements made in good faith and for the public good. Indeed, the references made by the court to the California statutes indicate an understanding that such statutes—rather than the First Amend-ment—could shield whistleblowers from retaliation. "Exposing governmental inefficiency and misconduct is a matter of considerable significance. As the Court noted in *Connick* [*v. Myers* (1983) 461 U.S. 138 [75 L.Ed.2d 708, 103 S.Ct. 1684]], public employers should, 'as a matter of good judgment,' be 'receptive to constructive criticism offered by their employees.' 461 U.S., at 149 [103 S.Ct. 1684]. The dictates of sound judgment are reinforced by the powerful network of legislative enactments—such as whistle-blower protec-tion laws and labor codes—available to those who seek to expose wrongdo-ing. See, *e. g.*, 5 U. S. C. § 2302(b)(8); Cal. Govt. Code Ann. § 8547.8 (West 2005); Cal. Lab. Code Ann. § 1102.5 (West Supp. 2006). Cases involving government attorneys implicate additional safeguards in the form of, for example, rules of conduct and constitutional obligations apart from the First Amendment. [Citations.] These imperatives, as well as obligations arising

from any other applicable constitutional provisions and mandates of the criminal and civil laws, protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions. [¶] We reject, however, the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties. Our precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job." (*Garcetti*, at pp. 425–426.)

In *Fiorillo, supra*, 795 F.2d 1544, the Federal Circuit "held that in order to be protected under the Whistleblower Protection Act the employee's primary motivation for making the disclosure must be a desire to inform the public, and not for vindictiveness or personal advantage." (*Horton, supra*, 66 F.3d at p. 282.) The Federal Circuit in *Horton* pointed out that "*Fiorillo* was overruled by Congressional action in 1988. The legislative history of that enactment explains: 'In *Fiorillo*[, *supra*, 795 F.2d at p. 1550], an employee's disclosures were not considered protected [under the federal WPA] because the employee's "primary motivation" was not for the public good, but rather for the personal motives of the employee. *The court reached this conclusion despite the lack of any indication in [the Civil Service Reform Act] that an employee's motives are supposed to be considered in determining whether a disclosure is protected.* [¶] The Committee intends that disclosures be encouraged. The [Office of Special Counsel], the Board and the courts should not erect barriers to disclosures which will limit the necessary flow of information from employees who have knowledge of government wrongdoing.' S.Rep. No. 413, 100th Cong., 2d Sess. 12–13 (1988)." (*Horton*, at pp. 282–283, italics added, quoting a 1988 Rep. of the Sen. Com. on Governmental Affairs.) In *Huffman v. Office of Personnel Management* (Fed.Cir. 2001) 263 F.3d 1341 (*Huffman*), the court discussed the legislative history of the 1994 change in the federal WPA (5 U.S.C. § 2302(b)(8)(A)) and acknowledged that the term " '*any* disclosure'—was deliberately broad," whereas the predecessor version of the statute "reciting that it was only a prohibited personnel action to take or fail to take a personnel action because of '*a* disclosure of information by an employee.' [Citation.]" (*Huffman, supra*, 263 F.3d at p. 1347.) The change in language in the federal WPA was directed toward countering the narrow approach taken by the Federal Circuit and the Merit Systems Protection Board (MSPB). The legislative history of that statute emphasized the intent of Congress that the statute was to be read broadly. The change of term from "a disclosure" to "any disclosure" in the statutory definition was " 'simply to stress that any disclosure is protected (if it meets the requisite reasonable belief test and is not required to be kept confidential).' [Citation.]" (*Huffman*, at p. 1348.)

Seizing on this distinction, the district contends that *Fiorillo* applies to Education Code section 87163, because "[t]hat language addressed in *Fiorillo*, mirrors that currently contained in Education Code section 87163." This is too slim a reed upon which to hang such a justification. First, neither Education Code section 87162 nor Education Code section 87163 refers to "a disclosure." Second, neither the *Fiorillo* majority nor the dissent ever mentioned or relied upon the word "a" in contrast to the word "any" preceding the word "disclosure" in their competing analyses of the federal statute. Most importantly, as discussed above, the legislative history evinces Congress's fundamental disagreement with the *Fiorillo* court's "primary motivation" limitation of the federal statute. The legislative history of the federal statute discloses that Congress *always* intended that the term "a disclosure" should be read broadly. In the face of contrary administrative and court determinations, Congress changed the term "a" to "any" to emphasize the point. (*Huffman, supra,* 263 F.3d at p. 1348.)

■ Moreover, it may often be the case that a personal agenda or animus towards a supervisor or other employees will be one of several considerations motivating the employee whistleblower to make a disclosure regarding conduct that the employee also reasonably believes violates a statute or rule or constitutes misconduct. That motivation is irrelevant to the purposes of the disclosure statutes. It easily could lead the finder of fact to detour around the central question of the employee's reasonable belief and down a circuitous byway in an attempt to discern the employee's motives by delving into the employee's relationships with coworkers, supervisors and the employer.

Nothing in Labor Code section 1102.5 and Education Code section 87160 et seq. persuade us that such a limitation was intended to be a part of these California statutes. (See also *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1384–1386 [37 Cal.Rptr.3d 113] (*Patten*) [differentiating under Lab. Code, § 1102.5, subd. (b), disclosures encompassing only internal personnel matters from disclosures where employee had reasonable cause to believe the information disclosed a violation of a state or federal statute].) Hence, it is not the *motive* of the asserted whistleblower, but the nature of the communication that determines whether it is covered.

(2) *Debatable Differences of Opinion Concerning Policy Matters Are Not Protected Disclosures*

Plaintiff contends the court erred in instructing the jury that "[d]ebatable differences of opinion concerning policy matters" were not disclosures of information under Labor Code section 1102.5, subdivision (b) and were not "protected disclosures" under Education Code section 87160 et seq. We agree. The court erred in failing to distinguish between the disclosure of

policies that plaintiff believed to be unwise, wasteful, gross misconduct or the like, which are subject to the limitation, and the disclosure of policies that plaintiff reasonably believed violated federal or state statutes, rules, or regulations, which are not subject to this limitation, even if these policies were also claimed to be unwise, wasteful or to constitute gross misconduct.

This debatable policy matters limitation on what constitutes a disclosure protected by the law is found in federal cases interpreting the scope of a protected disclosure under 5 United States Code section 2302(b)(8), part of the federal WPA, such as *White v. Department of the Air Force* (Fed.Cir. 2004) 391 F.3d 1377 (*White*). White had leveled criticism of an Air Force education program, "arguing that the standards were being imposed too rigidly, were academically unsound, and were impossible to meet or, at least, too burdensome." (*Id.* at p. 1379.) The Air Force lost confidence in White's ability to support the program and reassigned him. White filed an individual right of action alleging retaliation for protected whistleblowing in contravention of the federal WPA. The federal appellate court upheld the determination of the MSPB that "White had 'disclosed a debatable management decision regarding a policy matter,' and, as such, he did not have a reasonable belief that he disclosed gross mismanagement" under the federal statute. (391 F.3d at pp. 1380, 1383.) There was no claim on appeal that White had disclosed a violation of law. (*Id.* at p. 1381, fn. 1.) The Federal Circuit held that "where a dispute is in the nature of a policy dispute, 'gross mismanagement' requires that a claimed agency error in the adoption of, or continued adherence to, a policy be a matter that is not debatable among reasonable people." (*Id.* at p. 1383.) In reaching this determination, the court rejected the employer-agency's claim that criticism of agency policy can never be protected under the federal WPA, so long as that policy is not unlawful or a gross waste of funds. (391 F.3d at pp. 1381–1382.) Instead, the court acknowledged that "[m]ere differences of opinion between an employee and his agency superiors as to the proper approach to a particular problem or the most appropriate course of action do not rise to the level of gross mismanagement. . . ." (*Id.* at p. 1381.) Furthermore, "debatable differences of opinion concerning policy matters are not protected disclosures. Rather, for a lawful agency policy to constitute 'gross mismanagement,' an employee must disclose such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people." (*Id.* at p. 1382.) The *White* court noted that "[t]*his non-debatable requirement does not, of course, apply to alleged violations of statutes or regulations. In that circumstance, there may be a reasonable belief that a violation has occurred, even though the existence of an actual violation may be debatable*." (*Id.* at fn. 2, italics added.)[7]

---

[7] (Cf. *Chambers v. Department of the Interior* (Fed.Cir. 2008) 515 F.3d 1362, 1371; see *Miller v. Department of Homeland Security* (2009) 111 M.S.P.R. 312, 318 ["a disclosure of information reasonably believed to evidence a danger to public safety may be protected under

■ Those portions of special instructions Nos. 2 and 3 stating that "[d]ebatable differences of opinion concerning policy matters" are not protected disclosures, improperly conflated disclosures based on the belief that a policy was unwise, "economically wasteful or involves gross misconduct, incompetency, or inefficiency" (Ed. Code, § 87162, subd. (c)(2)), with disclosures founded upon a reasonable belief that a policy was *unlawful.* (See Ed. Code, § 87162, subd. (c)(1); Lab. Code, § 1102.5, subd. (b).) Disclosures related to the wisdom or efficacy of a policy are subject to the debatable policy matters limitation, where there is no claim that the disclosure was made because the employee reasonably believed the policy violated a statute, rule or regulation. Disclosures of a policy that the employee reasonably believes violates a statute or regulation are protected disclosures, *whether or not the existence of an actual violation or the wisdom of the policy are debatable.* Application of the debatable policy matters limitation broadly, to cases where the alleged whistleblower reasonably believes a policy violates the law, would eviscerate the reasonable belief standard in many, if not most, of such cases.

■ The confusion occurs because a policy may be challenged both as unwise, wasteful, gross misconduct, and the like *and* because the purported whistleblower reasonably believes the policy violates a statute or regulation. In such cases, it is error to give the debatable policy matters instruction without carefully explaining that the limitation does *not* apply to challenges where the issue is whether the plaintiff reasonably believed the policy violated a statute or regulation.

Plaintiff here alleged the district retaliated against her in violation of Education Code section 87160 et seq. Those allegations incorporated allegations of retaliation for protected disclosures of gross misconduct by the district. In special jury instruction No. 3, the court properly instructed the jury in conformity with Education Code section 87162 that a " 'protected disclosure' means a good faith communication that discloses or demonstrates an intention to disclose information that may evidence an improper governmental activity." (See Ed. Code, § 87162, subd. (e)(1).) It also accurately defined "improper governmental activity" as including activity that "violates a state or federal law or regulation," and also activity that is "economically wasteful or involves gross misconduct, incompetency, or inefficiency." (Ed. Code, § 87162, subd. (c)(1) & (2).) As plaintiff had raised the issue of "improper governmental activity," it was within the court's discretion to instruct the jury

5 U.S.C. § 2302(b)(8), even if the alleged danger was created by a policy decision"]; cf. *Auston v. Merit Systems Protection Bd.* (Fed.Cir. 2010) 371 Fed. Appx. 96, 101, fn. 2 ["Under the *White* standard, a policy constitutes 'gross mismanagement' only if a conclusion that the agency erred 'is not debatable among reasonable people.' [Citation.]"].)

in accordance with *White* with regard to plaintiff's claims implicating gross misconduct under Education Code section 87162, subdivision (c)(2).

■ However, the court erred in instructing the jury that debatable differences of opinion concerning policy matters are not "disclosures of information" in connection with plaintiff's Labor Code section 1102.5, subdivision (b) allegations or "protected disclosures," under Education Code section 87160 et seq., where plaintiff's disclosures allegedly were based on her reasonable belief the policies in question violated statutes or regulations. (Special jury instns. Nos. 2 and 3.) As *White* noted, the "non-debatable requirement does not . . . apply to alleged violations of statutes or regulations. In that circumstance, there may be a reasonable belief that a violation has occurred, even though the existence of an actual violation may be debatable." (*White, supra*, 391 F.3d. at p. 1382, fn. 2; accord, *Chambers v. Department of the Interior, supra*, 515 F.3d 1362.) The trial court here correctly instructed the jury that plaintiff must prove that she "disclosed information to a government or law enforcement agency where she had reasonable cause to believe that the information disclosed a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (See Lab. Code, § 1102.5, subd. (b).) It correctly instructed the jury that for it to find a violation of Education Code section 87160 et seq., plaintiff must prove she made a "protected disclosure" in which she "disclosed or demonstrated an intention to disclose 'improper governmental activities.' " However, the debatable policy matters limitation of special jury instructions Nos. 2 and 3 failed to distinguish disclosures regarding a purported violation of state or federal statutes, rules, or regulations, which require only that a plaintiff have a reasonable belief that a violation has occurred, from disclosures of policies that the plaintiff believes are economically wasteful or involve gross misconduct, incompetency, or inefficiency, as to which the debatable policy limitation applies.

■ The whistleblower provisions of the Labor Code and the Education Code with respect to disclosures of activities (including policies) that the employee has reasonable cause to believe violate state or federal statutes, rules or regulations, do not lend themselves to the debatable differences of opinion concerning policy matters standard articulated in *White* for evaluating claimed disclosures of waste, gross mismanagement, and the like. As *White* acknowledged, there will be circumstances in which a disclosure involves debatable differences of opinion concerning policy matters where the plaintiff has a reasonable belief that the policy violates a statute, rules or regulations. (*White, supra*, 391 F.3d at p. 1382, fn. 2.) Where this is the case, we read the federal cases as holding the debatable policy limitation inapplicable.

The trial court erred in instructing the jury without qualification that debatable differences of opinion concerning policy matters were not "disclosures of information" under Labor Code section 1102.5 or "protected disclosures" under Education Code section 87160 et seq.

(3) *Information Passed Along to a Supervisor in the Normal Course of Duties Is Not a Protected Disclosure.*

This instruction was erroneous under both federal law and established California law. The instruction appears based on federal cases such as *Huffman, supra,* 263 F.3d 1341, 1352, in which the Federal Circuit stated that a public employee who, as a part of his normal job duties, reports employee wrongdoing through normal channels is not protected by the federal WPA. (*Huffman,* at pp. 1351–1352; see also *Willis v. Department of Agriculture* (Fed.Cir. 1998) 141 F.3d 1139, 1143.[8]) The *Huffman* court reached this conclusion after reviewing the legislative history of the federal WPA, which indicated that the federal statute was enacted to "protect employees who go above and beyond the call of duty and report infractions in the law that are hidden." (*Huffman,* at p. 1353, fn. omitted.) With respect to the "normal duties" limitation, the *Huffman* court distinguished "three quite different situations." (*Id.* at p. 1352.) First, where the employee has, as part of his or her normal duties, been assigned the task of investigating and reporting wrongdoing by government employees and reports that wrongdoing through normal channels, such reporting is *not* a protected disclosure covered by the federal WPA. (*Huffman,* at p. 1352.) Second, where "an employee with such assigned investigatory responsibilities reports the wrongdoing *outside* of normal channels" (*id.* at p. 1354, italics added), for instance where the normal chain of command is unresponsive, the disclosure is protected. Third, a report *may be* a protected disclosure where the employee is obligated to report the wrongdoing, but such report is not part of the employee's normal duties or the employee has not been assigned those duties. (*Ibid.*) The *Huffman* court remanded the matter to the MSPB to allow it to consider whether certain reports concerning the conduct of other employees fell into the first, second, or third category. (*Id.* at p. 1355.)

█ In contrast, Labor Code section 1102.5 subdivision (e) *expressly provides* that "[a] report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency . . ." subject to the statute's protections. This amendment

---

[8] "Discussion and even disagreement with supervisors over job-related activities is a normal part of most occupations. It is entirely ordinary for an employee to fairly and reasonably disagree with a supervisor who overturns the employee's decision. In complaining to his supervisors, Willis has done no more than voice his dissatisfaction with his superiors' decision." (*Willis v. Department of Agriculture, supra,* 141 F.3d at p. 1143.)

became effective on January 1, 2004. (Stats. 2003, ch. 484, § 2, p. 3518.) However, even the former version of section 1102.5 has been consistently interpreted to protect a public employee who reports legal violations to his or her own employer rather than to a separate public agency, where the employer or supervisor is not the suspected wrongdoer. (*Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1308, 1312–1313 [130 Cal.Rptr.2d 347] (*Colores*) [state employee who uncovered the unauthorized use of state assets and reported her findings to a supervisor who had investigative authority over the assets qualified as a whistleblower under § 1102.5, subd. (b)]; *Gardenhire v. Housing Authority* (2000) 85 Cal.App.4th 236, 241–243 [101 Cal.Rptr.2d 893] [employee of L.A. City Housing Authority prevailed on whistleblower claim where she had informed housing authority commissioners of consulting contractor's improprieties].) In *Colores*, the Court of Appeal rejected the argument of the university employer that the plaintiff could not be deemed a whistleblower since she "merely did her job when she reported wrongdoing to [her supervisor] Avery" and it was Avery, not the plaintiff, who reported the embezzlement to legal authorities. (*Colores*, at p. 1312.) According to *Colores*, "The university applies the concept of whistleblowing too narrowly. It is true that *plaintiff was simply doing her job* when she uncovered the unauthorized use of state assets by [persons associated] with facilities operations. It is also true that she reported her findings to Avery rather than to some other governmental agency. This, however, will not defeat her right to whistleblower status. First, plaintiff was employed by a governmental agency and she had every reason to expect that Avery would not sweep the information under the rug but rather would conduct an investigation into the matter, as Avery did. Thus, plaintiff, in contrast to an employee of a private employer, had no need to inform some other governmental agency in order to qualify as a 'whistleblower' within the meaning of Labor Code section 1102.5, subdivision (b). (Compare with *Green v. Ralee Engineering Co.* [(1998)] 19 Cal.4th [66,] 72–73, 76–77 [78 Cal.Rptr.2d 16, 960 P.2d 1046].[9])" (*Colores*, at pp. 1312–1313, italics added; see also *Patten, supra*, 134 Cal.App.4th at pp. 1385–1386 [confirming that under Lab. Code, § 1102.5, a state employee who was " 'simply doing her job' " when she uncovered illegal program expenditures and disclosed them to her employer and to legislative personnel, raised a triable issue of fact as to whether the disclosures constituted protected whistleblowing].)

---

[9] In *Green v. Ralee Engineering Co., supra*, 19 Cal.4th 66, 77, our Supreme Court affirmed the Court of Appeal's reversal of summary judgment for the employer in a wrongful discharge action based on an employee's internal report to a private employer. The Supreme Court acknowledged that Labor Code section 1102.5 provided protection for employees reporting to public agencies, but held that federal safety regulations governing commercial airline safety provided a basis for declaring a public policy in the context of this retaliatory discharge action.

The district terms *Colores, supra*, 105 Cal.App.4th 1293, "inapposite," arguing that it was not a Labor Code section 1102.5, subdivision (b) claim, but was a public policy termination and that *Colores* did not address the matter under the strictures of section 1102.5, but under general public policy principles. We are not persuaded. As demonstrated by the excerpt quoted above, the *Colores* opinion rests upon its analysis of the "whistleblower" protections of Labor Code section 1102.5, subdivision (b). That reasoning was followed in *Patten, supra*, 134 Cal.App.4th at pages 1385–1386. Furthermore, any doubt on this point would have been remedied by the addition of Labor Code section 1102.5, subdivision (e) to expressly so provide.

■ The court erred in instructing the jury that information passed along to a supervisor in the normal course of duties was *not* a protected disclosure under California law. In circumstances where the supervisor is *not* the alleged wrongdoer (i.e., the supervisor's own conduct is not the asserted wrongdoing that is being disclosed to that supervisor), it cannot categorically be stated that a report to a supervisor in the normal course of duties is not a protected disclosure.

(4) *Reporting Publicly Known Facts Is Not a Protected Disclosure.*

■ We are persuaded that this was a proper limitation on what constitutes disclosure protected by California law. We agree with *Huffman, supra*, 263 F.3d 1341, 1349–1350, and other federal cases that have held that the report of information that was already known did not constitute a protected disclosure. (See, e.g., *Meuwissen v. Department of Interior* (Fed.Cir. 2000) 234 F.3d 9, 12–13 [report of publicly known information that constituted a decision in the course of adjudication was not the kind of disclosure the federal WPA was intended to protect]; *Francisco v. Office of Personnel Management* (Fed.Cir. 2002) 295 F.3d 1310, 1314 [report of information already publicly known did not constitute a protected disclosure].) We also read the term "disclosure" consistent with its "ordinarily understood meaning." (*Huffman*, at p. 1349.) "[T]he term 'disclosure' means to reveal something that was hidden and not known." (*Id.* at pp. 1349–1350; see Webster's 3d New Internat. Dict. (1968) p. 645.)[10] Both Labor Code section 1102.5 and Education Code section 87162, subdivision (e), use variants of the term "disclose" (i.e., "disclosing" and "discloses" in Lab. Code, § 1102.5,

---

[10] "The term 'disclosure' is defined in *Webster's Dictionary* as 'the act or an instance of disclosing: the act or an instance of opening up to view, knowledge, or comprehension.' *Webster's Third New International Dictionary* 645 (1968). That dictionary further defines 'disclose' as: '2a: to expose to view . . . : lay open or uncover (something hidden from view) <excavations disclosed many artifacts> b: to make known: open up to general knowledge.' *Id.*" (*Huffman, supra*, 263 F.3d at p. 1349.)

subd. (b), and "[p]rotected disclosure" in Ed. Code, § 87162, subd. (e)) and there is no reason to believe the terms were being used in anything other than their ordinary sense.

This conclusion is consistent with those cases holding that the employee's report to the employee's supervisor about the supervisor's own wrongdoing is not a "disclosure" and is not protected whistleblowing activity, because the employer *already knows* about his or her wrongdoing (*Huffman, supra,* 263 F.3d at pp. 1349–1350; see, e.g., *Reid v. Merit Systems Protection Bd.* (Fed.Cir. 2007) 508 F.3d 674, 678 (*Reid*); *Horton, supra,* 66 F.3d at p. 282.) Moreover, criticism delivered directly to the wrongdoers does not further the purpose of either the federal WPA or the California whistleblower laws to encourage disclosure of wrongdoing to persons who may be in a position to act to remedy it. (*Huffman, supra,* 263 F.3d at pp. 1349–1351[11]; *Horton,* at p. 282; see *Colores, supra,* 105 Cal.App.4th at pp. 1312–1313.) In California cases holding that a public employee's report of wrongdoing to his or her *own* employer is not excluded from qualifying as a disclosure protected under the Labor Code, the superior to whom the report is made is not the person involved in the alleged wrongdoing. (See *Colores, supra,* 105 Cal.App.4th at pp. 1312–1313; *Patten, supra,* 134 Cal.App.4th at p. 1386.)

The court did not err in instructing that reporting publicly known facts is not a disclosure protected by the California whistleblower statutes at issue here.

(5) *Efforts to Determine if a Practice Violates the Law Are Not Protected Disclosures.*

██ This appears to us to be a correct statement of the law, extrapolated from *Reid, supra,* 508 F.3d 674. There, the Federal Circuit held that a government employee's alerting an innocent supervisor of an accused wrongdoer to a potential violation might qualify as a protected disclosure where the violation had not yet occurred, but was imminent. (*Id.* at p. 678.) In so holding, the *Reid* court opined: "In holding that a disclosure of an impending action can qualify under the [federal] WPA, we do not intend to convey the idea that any mere thought, suggestion, or discussion of an action that someone might consider to be a violation of a law, rule, or regulation is a justification for a whistleblower complaint. *Discussion among employees and*

---

[11] *Huffman* also noted that where a government employee reports to a wrongdoer that the conduct engaged in by the wrongdoer is unlawful, "the report would not be a protected disclosure. It is clear from the statute, 5 U.S.C. § 2302(b)(8)(A), that the disclosure must pertain to the *underlying conduct*, rather than to the asserted fact of its unlawfulness or impropriety, in order for the disclosure to be protected by the WPA." (*Huffman, supra,* 263 F.3d at p. 1350, fn. 2, italics added.)

*supervisors concerning various possible courses of action is healthy and normal in any organization. It may in fact avoid a violation. When such discussion proceeds to an instruction to violate the law must depend on the facts of a given case.* But a holding that an instruction to carry out an act can never qualify under the WPA if the act never occurred is too bright a line. The determination depends on the facts." (*Ibid.*, italics added.) The instruction given by the court here appears consistent with *Reid* and it makes sense in the context of attempting to avoid violations.

D. *"Intentional" Retaliation Instruction of Special Jury Instruction No. 3, Paragraph 6*

Plaintiff contends the instruction erroneously required the jury to find the district intended to retaliate against her. Over plaintiff's objection, the court instructed the jury that to find a violation of the Education Code, it must find "[t]hat Defendants Marin Community College District and Board of Trustees of Marin Community College District took actions described in Paragraph 2, above, [removing plaintiff from the position of dean of enrollment services; placing plaintiff on administrative leave; or engaging in conduct that, taken as a whole, materially and adversely affected the terms and conditions of plaintiff's employment] *with the intention of retaliating* against Plaintiff." (Italics added.) The court based this instruction on Education Code section 87164, subdivisions (b) and (h).

Plaintiff argues that Education Code section 87164, subdivision (h) does not have any application to the essential elements of her proof, but simply establishes an employee's right to bring a civil damages action, as well as describing other available damages and remedies. Subdivision (h) provides in relevant part: "In addition to all other penalties provided by law, a person who *intentionally* engages in acts of reprisal, retaliation, threats, coercion, or similar acts against an employee or applicant for employment with a public school employer for having made a protected disclosure shall be liable in an action for damages brought against him or her by the injured party. . . ." (Ed. Code, § 87164, subd. (h), italics added.) Plaintiff further contends that the challenged instruction increased her burden of proof beyond that required by subdivision (j) of section 87164. Education Code section 87164, subdivision (j) states that, "once it has been demonstrated by a preponderance of evidence that an activity protected by this article was a contributing factor in the alleged retaliation . . . the burden of proof shall be on the . . . employer to demonstrate by clear and convincing evidence that the alleged action ·would have occurred for legitimate, independent reasons even if the employee had not engaged in protected disclosures or refused an illegal order. . . ." (Ed. Code, § 87164, subd. (j).) The jury was so instructed.

Plaintiff ignores subdivision (b) of Education Code section 87164, providing in relevant part: "A person who *intentionally* engages in acts of reprisal, retaliation, threats, coercion, or similar acts against an employee or applicant for employment with a public school employer for having made a protected disclosure is subject to a fine not to exceed ten thousand dollars ($10,000) and imprisonment in the county jail for a period not to exceed one year. An employee, officer, or administrator who *intentionally* engages in that conduct shall also be subject to discipline by the public school employer. . . ." (Italics added.)

██ Education Code section 87164, subdivisions (b) and (h) expressly require that the person engaging in retaliation do so "intentionally." Nothing in that requirement undermines the burdens of proof set forth in section 87164, subdivision (j) and plaintiff does not demonstrate how the burdens of proof are undermined by this requirement. Once an employee has demonstrated by a preponderance of evidence that an activity protected by the statute was a contributing factor in the alleged intentional retaliation, the burden of proof shifts to the employer to demonstrate by clear and convincing evidence that action alleged to be retaliatory would have occurred for legitimate, independent reasons.

The court did not err in giving this instruction.

E. *Limiting Instruction Based on Education Code Section 87164,*
 *Subdivision (i)*

Plaintiff contends the court erred in instructing the jury as follows: "If said Defendants reasonably believed that they were justified in removing Plaintiff from her position of Dean of Enrollment Services and/or placing Plaintiff on administrative leave on the basis of evidence separate and apart from the fact that Plaintiff made a 'protected disclosure' as that term is defined in these instructions, then said Defendants are not liable to Plaintiff under the provisions of Education Code § 87160 *et seq.*"

This instruction was based upon Education Code section 87164, subdivision (i), which provides: "This section is not intended to prevent a public school employer, school administrator, or supervisor from taking, failing to take, directing others to take, recommending, or approving a personnel action with respect to an employee or applicant for employment with a public school employer if the public school employer, school administrator, or supervisor reasonably believes an action or inaction is justified on the basis of evidence separate and apart from the fact that the person has made a protected disclosure as defined in subdivision (e) of Section 87162."

██ Plaintiff maintains that the instruction fashioned by the court creates an affirmative defense that allowed the district to evade its burden under

Education Code section 87164, subdivision (j) to demonstrate by clear and convincing evidence that the actions taken against her would have occurred for "legitimate, independent reasons," had she not made protected disclosures. She admits that under her interpretation, the provisions of section 87164, subdivision (i) cannot be reconciled with the higher degree of proof required by subdivision (j). As we do not adopt plaintiff's premise, we see no conflict. Once plaintiff has shown by a "preponderance of evidence" that a protected disclosure or activity "was a contributing factor in the alleged retaliation," the burden shifts to the district to show by "clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in protected disclosures or refused an illegal order. . . ." (Ed. Code, § 87164, subd. (j).) One way for the district to do so is to demonstrate by clear and convincing evidence that those engaging in the alleged retaliation reasonably believed their conduct was justified on the basis of evidence separate and apart from the fact that the employee made a protected disclosure. Although the instructions were somewhat redundant in this respect, we do not believe they incorrectly stated the law, lessened the district's burden of proof, or unduly and unfairly overemphasized the district's defenses to plaintiff's prejudice.

## F. *Prejudice*

Having determined that the court erred in instructing the jury that plaintiff must prove that any disclosure was made in good faith and for the public good and not for personal reasons; that debatable differences of opinion concerning policy matters are not protected disclosures under Labor Code section 1102.5, subdivision (b); and that information passed along to a supervisor in the normal course of duties is not a protected disclosure, we move to consideration of the question of prejudice. As stated above, "[T]here is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) . . ." (*Soule v. General Motors Corp., supra*, 8 Cal.4th at p. 580 (*Soule*).)

The district does not directly argue that any instructional error was harmless. Rather, in a somewhat perplexing argument, it asserts that "a review of the record shows that separate and apart from these instructions, substantial evidence exists to support the verdict finding that no disclosures were made by [plaintiff] under Labor Code and Education Code Whistleblowing Statutes." This is not the standard for assessment of the prejudicial impact of erroneous instructions. Rather, we must view the evidence in the light most

favorable to the claim of instructional error and must assume the jury might have believed the evidence favorable to the appellant on those issues as to which it was misdirected. (*Henderson v. Harnischfeger Corp., supra*, 12 Cal.3d 663, 674; *Ayala v. Arroyo Vista Family Health Center, supra*, 160 Cal.App.4th 1350, 1358; *Whiteley v. Philip Morris, Inc., supra*, 117 Cal.App.4th 635, 655; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 8:120, pp. 8-75 to 8-76.) "Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Soule, supra*, 8 Cal.4th at p. 580; accord, *Ted Jacob Engineering Group, Inc. v. The Ratcliff Architects, supra*, 187 Cal.App.4th at p. 961.) In assessing whether a "miscarriage of justice" has occurred, "[t]he reviewing court should consider not only the nature of the error, 'including its natural and probable effect on a party's ability to place his full case before the jury,' but the likelihood of actual prejudice as reflected in the individual trial record, taking into account '(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.' ([*Soule,*] at pp. 580–581.)" (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983 [67 Cal.Rptr.2d 16, 941 P.2d 1203]; accord, *Whiteley v. Philip Morris, Inc., supra*, 117 Cal.App.4th at p. 656.)

While the instructional errors did not prevent plaintiff from placing her full case before the jury (*Soule, supra*, 8 Cal.4th at pp. 580–581), no other instructions mitigated the impact of the erroneous instructions.

Plaintiff's counsel stated in closing argument that there was no evidence of a personal reason for plaintiff's various "disclosures." However, the evidence presented easily could have led the jury to find that plaintiff was motivated by personal reasons, such as a dislike of Martinez, dissatisfaction with the new direction of the college toward increasing enrollment, and a desire to "set up" the employer by casting herself as a whistleblower. However, we need not decide whether this instruction alone would have prejudiced plaintiff, as we are convinced that the two other erroneous instructional errors did so.

Plaintiff's counsel did discuss the limiting instructions at issue here and urged the jury that they did not apply to the present case where plaintiff reasonably believed the actions she disclosed were illegal and where she disclosed them to persons other than her direct supervisor Martinez, such as to White and others. Defendants referred to the limiting instruction regarding "policy disputes," terming an incident in which plaintiff questioned the residency of a particular student as a "classic example of the exception that says disagreements over policy are not disclosure." Similarly, defense counsel argued, in seeking opinions from various counsel, plaintiff did not make protected disclosures but was seeking advice. He further argued that the

opinion plaintiff received from Black regarding the collection of fees at registration was not an opinion on legality, but an "opinion of policy."

### 1. *Tampering Allegation.*

(a) *Information passed to a supervisor in the normal course of duties.* The jury expressed confusion related to the instruction that information passed to a supervisor in the normal course was a protected disclosure. Plaintiff argues that her disclosures to White were all about matters outside of plaintiff's normal duties and assignments. That being the case, the jury could not have determined that the information was passed along to a supervisor *"in the normal course"* and it is not reasonably probable that it was misled by that portion of the erroneous jury instruction. However, the jury's questions during deliberations indicated confusion over who was a supervisor and whether a disclosure to White would have been protected.[12] (If the jury determined Martinez was a "wrongdoer" in any of the asserted disclosures of conduct plaintiff reasonably believed to be illegal—e.g., the claim of "tampering with the hiring process"—disclosure to her was *not* a protected disclosure.)

The court initially answered that White *was* plaintiff's supervisor for purposes of special jury instruction No. 2 regarding Labor Code section 1102.5, subdivision (b). Later, the jury asked, "If plaintiff discloses a potential or actual illegal act to Dr. White, does that preclude or prevent disclosure under Special Jury Instructions 2 and 3 (1102.5(b) and 87160) because Dr. White is her supervisor?" The court did not answer this question, responding: "We don't understand this question. Please clarify." The jury tried again, asking: "Given that Dr. White represents Marin Community College district, is Plaintiff able to 'disclose' to her even though Dr. White is her supervisor?" This time the court answered, "Yes." It appears, therefore, that the court having given an initial answer that was factually correct, but that would have exacerbated the error contained in the instruction, attempted to remedy that confusion and error by correctly advising the jury that a disclosure to White would have been protected.

(b) *Debatable policy decision.* We cannot say that the erroneous instruction that a debatable policy decision was not protected under Labor Code section

---

[12] On September 10, 2009, the jury asked:

"(1) Is Dr. White considered plaintiff's supervisor in addition to Martinez re Spec. Instruction # 2?

"(2) Does Marin Community College District = Dr. White re disclosure target?

"(3) Definition of 'disclosure'?"

The court responded: "1. Yes. [¶] 2. Yes. [¶] 3. See Special Instructions #2 and #3 (pages 22, 23, and 24 of the jury instructions)."

1102.5, subdivision (b), was harmless in connection with plaintiff's alleged disclosure to White concerning Martinez's tampering with the hiring process. The district argues that as to the alleged tampering with the hiring process, there was no allegation of a violation of state or federal law or regulation; that White's requiring that the committee submit three names was a policy determination; and that plaintiff's refusal was insubordinate. However, plaintiff testified that she believed that Martinez had "tampered" with the process, setting it up for a particular person she had worked with before and that such was illegal. (Consequently, disclosure to Martinez would not have been protected.) Despite plaintiff's belief that Martinez's conduct violated the Education Code, plaintiff never advised White she believed Martinez's conduct was "illegal," as she assumed White knew that, given the Education Code section posted on her Web site and that White would understand her concern that the conduct was illegal. It was for the jury to determine whether plaintiff held such beliefs and whether those beliefs were reasonable. Moreover, the disclosure was not that plaintiff believed the conduct was illegal, but her disclosure to White of the asserted illegal conduct itself—i.e., Martinez's setting up the job for a particular candidate. Assuming that the jury believed plaintiff's evidence, the erroneous instruction that debatable differences of opinion concerning policy matters are not "protected disclosures" under Education Code section 87160 et seq. or "disclosures of information" under Labor Code section 1102.5, subdivision (b), likely led the jury to determine that there was no protected disclosure, as the question was one of debatable policy, even if plaintiff reasonably thought the conduct was illegal. We cannot conclude this error was harmless.

**2. *The EEIF scholarship allegation.*** It is conceded by all that the purported disclosure of illegality of the scholarship program was not part of plaintiff's normal job responsibilities. Her reports to Martinez and White of her concerns as to the illegality of the scholarship were reports *to her superiors* within the coverage of the whistleblower protections. Martinez and White were not the purported "wrongdoers" in this instance and plaintiff's reports to Martinez and to White would have been protected disclosures, had the jury believed plaintiff's evidence. (Plaintiff's inquiry of Bob Henry's office regarding the legality of such a scholarship was not a protected disclosure, as it was clearly an attempt by plaintiff to determine whether and/or to gain support for her view that the grant was unlawful.) That plaintiff may have been wrong in her understanding of the nature of the program or the grant does not necessarily render her belief in the unlawfulness of the scholarship unreasonable. Nor can we say as a matter of undisputed fact that the terms of the program or grant were publicly known. That question was for the jury. It is reasonably probable that had the jury believed plaintiff's evidence, they would have rendered a verdict more favorable to plaintiff on this claim, had they not been erroneously instructed.

■ **3.** *Registration without payment of fee.* Again, plaintiff's discussion of the matter with Black as counsel for the chancellor's office was not a protected disclosure, but an attempt to determine the legality of the policy and to gain support for her view of the policy as unlawful. Furthermore, errors in the instructions regarding disclosure to a superior in the normal course, or whether there was a debatable policy dispute, were necessarily harmless, as the policy of allowing students to register for noncredit courses without paying fees they owed was already well known to White. Plaintiff was not disclosing any previously unknown or hidden conduct, practice or policy, but only her view that the known policy was not lawful. That plaintiff views a publicly known policy as unlawful is not a disclosure protected by law. (See, e.g., *Huffman, supra,* 263 F.3d at p. 1350, fn. 2.)

The jury was instructed in response to its question whether posting on a list-serv constituted publicly known facts, that it was a question of fact for it to decide. As we have determined that the jury was not erroneously instructed that disclosure of a publicly known fact was not protected, this response was accurate and does not indicate any confusion under the other instructions that we have determined were erroneously given.

**4.** *Citizenship questions.* The same is true with respect to plaintiff's report to Martinez of her view that questions regarding citizenship on the noncredit application were required by law. The policy and practice of the college was publicly known, as made clear by Martinez's statements at a March meeting of the management council that plaintiff attended. Nor did plaintiff's inquiry of Black of the chancellor's office as to whether student residency information should be retained for noncredit students transform that attempt to determine the lawfulness of the policy into a protected disclosure of information. In addition, we note that if Martinez was the purported "wrongdoer" in directing plaintiff to remove the questions from the credit application, plaintiff's report to her was not a disclosure protected by law.

■ **5.** *Plaintiff has shown prejudice.* We conclude that had the jury believed plaintiff's evidence, it is reasonably probable that it would have rendered a verdict more favorable to her on her whistleblower claims related to her disclosure to White of Martinez's alleged tampering with the hiring process had it not been erroneously instructed that "debatable differences of opinion concerning policy matters are not protected disclosures." Further, had the jury believed plaintiff's evidence, it is reasonably probable they would have rendered a verdict more favorable to her on claims related to her disclosures to Martinez and White regarding her concerns about the La Academia grant/EEIF program, had it not been erroneously instructed that "debatable differences of opinion concerning policy matters are not protected disclosures," and that "[i]nformation passed along to a supervisor in the

normal course of duties is not a protected disclosure." We shall therefore reverse the judgment and remand for retrial of those claims. These instructional errors require reversal and remand for a new trial.

**6.** *Undue pressure allegation.* In light of our decision, we need not address plaintiff's assertion that the trial court placed "improper pressure" on the jury to conclude deliberations by September 11, 2009, the last day before the judge left for her two-week vacation. Nevertheless, we have reviewed the entire record and do not see anything improper or prejudicial in the court's having kept the jury informed at the outset of the case and, as September 11 approached, that the jury would need to return after a two-week break, if it did not reach a verdict before the judge left for vacation. The judge did not pressure the jury and the jury never indicated it was "deadlocked" or gave any other indication that it was feeling "pressured."

Because the question regarding the admissibility of evidence of plaintiff's eligibility for retirement and related instructions is likely to arise on retrial, we address that issue.

## II. Evidence of Plaintiff's Eligibility for Retirement

The trial court allowed the district to introduce evidence of plaintiff's eligibility to retire from her employment with the district and the projected retirement income she would receive as relevant to the question whether she had mitigated her damages. Plaintiff contends that the court committed several errors in allowing this evidence and in giving related instructions. She first contends the court erred in denying her motions in limine seeking to exclude evidence of her pension benefits should she elect to retire. (Motions in limine Nos. 1 and 6.) She contends the court erroneously admitted evidence that she was eligible to retire with the district and evidence of the amount of pension benefits she could receive if she did retire. She contends the court erroneously instructed the jury in special instruction No. 6 that it was "entitled to consider the availability" to plaintiff of a retirement pension and that "[t]he extent to which such a retirement pension could reduce" her damages was an issue of fact for the jury.[13] Finally, she contends that questions Nos. 17 and 18 on the special verdict form were erroneous and

---

[13] Before instructing the jury, the court sustained an objection by plaintiff to the instruction sought by defendants that would have *required* the jury to deduct her retirement income from any damages. The court explained: "I ruled in limine that the jury could be told that Plaintiff had the right to retire and what her retirement income would be. I don't believe the jury should be ordered to deduct that income from any damages it might choose to award to the Plaintiff, and I did not intend the fact that that information could be furnished to the jury to be in the form of a mitigation of damages instruction." No other mitigation of damages instruction was given.

reinforced the error contained in special instruction No. 6, despite the jury's failure to reach these questions by virtue of its answers to previous special verdict questions.[14]

The foregoing claims of error all hinge on plaintiff's claim that the court erroneously determined that evidence concerning her eligibility to retire and the amount of her retirement pension was admissible on the issue of mitigation of her damages and that the jury could determine whether and to what extent such retirement pension could reduce her damages.

## A. Evidence and Instructions on Retirement Income

Plaintiff's counsel argued that the question of plaintiff's retirement eligibility and projected retirement income was akin to raising the issue of whether a defendant was insured, that the introduction of the evidence was prejudicial, and that she had an absolute right to stay in her tenured counselor job and not be forced to retire. In denying plaintiff's motions in limine seeking to exclude evidence of her eligibility for retirement and a specific exhibit (exhibit No. 61) introduced by the district as to its calculations of her retirement pension, the trial court explained that the issue did not involve the collateral source rule, "so let's stop talking about offsets. The issue is whether it's relevant." The court also discounted plaintiff's argument that permitting the introduction of retirement benefit evidence as mitigation evidence could completely undermine causes of action for unlawful age discrimination in employment, observing that this case did not involve an issue of plaintiff's being fired because of her age or gender. The court reasoned that because plaintiff's "pension benefits derived directly from her employment at College of Marin, they are available to her, they're relevant." The court granted plaintiff's motion in limine to preclude admission of evidence of other possible sources of income she might have (such as inheritance) under Evidence Code section 352. As a result of the court's rulings, both plaintiff and defense witnesses presented evidence of plaintiff's projected earnings should she choose to retire.

Plaintiff's expert witness, economist Barry Ben-Zion, opined as to her present and future loss of income due to the differences in salary in the dean position and her current employment as a tenured counselor and the loss of future pension as a result. He calculated that as a woman age 65 years four months at the time of trial, with an advanced college degree, plaintiff would be expected to work until age 69 and three months, for another 3.83 years. He calculated her damages as $185,707, including loss of income from the

---

[14] We need not address plaintiff's claims with respect to the special verdict questions Nos. 17 and 18.

difference between her dean position ($78,526 past income loss; $107,181 future income loss) plus $166,228 in lost retirement income, assuming she worked to age 69.14, for total damages of $351,935.

The district presented evidence through Linda Beam, the district's executive dean of human resource and labor relations, that plaintiff's salary as a counselor (approximately $80,000) was approximately $20,000 less than her unmodified pension would be were she to retire as of the trial date. Her unmodified pension is $100,788. Her salary as dean was $114,096, and she pays 8 percent or more than $9,000 into the STRS (State Teachers' Retirement System). Beam testified the difference between plaintiff's salary as dean and her current retirement income was less than $5,000 per year and that she would receive a lump-sum payment of $20,000 on retirement.

Plaintiff testified that she wanted to continue to work. She testified she had seen no other dean jobs available at other colleges since her reassignment and that if she were to take a job with another district, she would lose 30 years of tenure. Plaintiff had paid 8 percent of her salary into the retirement system for the last 36 years and it was available to her in a lump sum on retirement or as an annuity. She also testified she could take a modified retirement, taking a lower payout and enabling her beneficiary to continue to receive money following her death. She testified she did not want to retire, in part because she did not want to have to make the election between a modified or an unmodified retirement as her son had become seriously ill with a disabling illness and she had been supporting him. She did not know whether he would get better. She testified she "would probably take a modified" retirement payout or arrange for an annuity to enable her son to support himself after her death, if he did not recover. However, she would rather take an unmodified retirement. Therefore, she would prefer to wait until she had a better idea of her son's progress before electing to take a modified or unmodified retirement.

The court instructed the jury as follows: "In considering Plaintiff's damages, you are entitled to consider the availability to her of a retirement pension. The extent to which such a retirement pension could reduce plaintiff's damages is an issue of fact for the jury to determine." (Special instn. No. 6.) In the district's closing argument, counsel discussed its calculation of plaintiff's salary and exhibit No. 61, comparing her salary and her retirement income, concluding that with the addition of her Social Security, her retirement income would be approximately $106,000 per year and "her pension is $1,000 more than what she would have put in her pocket pre-tax if she remained in the Dean's position." The district argued it had shown plaintiff had suffered no monetary damages and argued that the district should not be

asked to "make up the difference" should plaintiff choose to continue in her counselor position rather than retire.[15]

The jury found the district had violated Labor Code section 1102.5, subdivision (a), but that plaintiff was not harmed thereby. It found no violation of Labor Code section 1102.5, subdivision (b) or Education Code section 87160 et seq., and no damages from any violation of the statutes.

## B. *No Due Process Violation*

Plaintiff argues on appeal that as a "permanent employee" of the district in her tenured counselor position, she has an enforceable right to continued employment with the district and a property interest protected by the due process clause of the Fourteenth Amendment. However, application of the avoidable consequences doctrine here does not deprive her of that property interest. She is not required to retire. Nor was she ever asked to give up her tenured position. We see no violation of *due process* in allowing the jury to consider her ability to retire and the retirement income available to her.

However, as discussed below, we believe that the court erred in admitting evidence of plaintiff's retirement eligibility and income on the issue of mitigation of her damages and erred in instructing the jury it could consider whether and in what amount to reduce any damages suffered by plaintiff in light of that evidence.

## C. *The Law: Mitigation of Damages/the Avoidable Consequences Doctrine*

■■■ The right to recover damages in civil actions is qualified by the common law doctrine of avoidable consequences. Under the doctrine, "a person injured by another's wrongful conduct will not be compensated for damages that the injured person could have avoided by reasonable effort or expenditure." (*State Dept. of Health Services v. Superior Court (McGinnis)* (2003) 31 Cal.4th 1026, 1043 [6 Cal.Rptr.3d 441, 79 P.3d 556] (*McGinnis*);

---

[15] Counsel for the district urged the jury to find no liability, concluding: "And where will that leave Ms. Mize-Kurzman? Well, it leaves her with choices. She can choose to stay where she is as a Counselor. She says that that position is not a challenging position for her. Or, she can exercise her right, and it is her decision, we're not—no one is suggesting that Ms. Mize-Kurzman should resign, it's her choice, it's her decision to do it, and if she does, through a combination of pension and Social Security, her income will go up by approximately $30,000 over what it is now, and she won't have to work. [¶] Whether she would choose to take her pension and find some other position somewhere else is her choice, and we express no opinion on it. [¶] We just, however, do not think that if she chooses a course that reduces her income, that is something that you should look at, and you should evaluate, and you should determine whether you think it is fair to have the College of Marin, Frances L. White, and Anita Martinez, make up the difference on it."

see Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2011) ¶ 17:490, pp. 17-78.14 (rev. # 1, 2011) to 17-79 (rev. # 1, 2008).) "[B]oth public and private employees faced with a wrongful discharge have a legal duty to mitigate damages while pursuing remedies against their former employer. (*California School Employees Assn. v. Personnel Commission* (1973) 30 Cal.App.3d 241, 245, 249 [106 Cal.Rptr. 283] (*CSEA*).)" (*Candari v. Los Angeles Unified School Dist.* (2011) 193 Cal.App.4th 402, 409 [122 Cal.Rptr.3d 53] (*Candari*).) It is the employer's burden "to affirmatively prove failure to mitigate as an affirmative defense." (*Ibid.*; see *McGinnis, supra,* 31 Cal.4th at p. 1044.)

 As the Supreme Court explained in *Parker v. Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 181–182 [89 Cal.Rptr. 737, 474 P.2d 689] (*Parker*): "The general rule is that the measure of recovery by a wrongfully discharged employee is the amount of salary agreed upon for the period of service, less the amount which the employer affirmatively proves the employee has earned or with reasonable effort might have earned from other employment. [Citations.] [Fn. omitted.] However, before projected earnings from other employment opportunities not sought or accepted by the discharged employee can be applied in mitigation, the employer must show that the other employment was comparable, or substantially similar, to that of which the employee has been deprived; the employee's rejection of or failure to seek other available employment of a different or inferior kind may not be resorted to in order to mitigate damages. [Citations.]" (Accord, *Candari, supra,* 193 Cal.App.4th at p. 409; *Davis v. Los Angeles Unified School Dist. Personnel Com.* (2007) 152 Cal.App.4th 1122, 1140–1141 [62 Cal.Rptr.3d 69]; *Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 595 [36 Cal.Rptr.3d 154]; *West v. Bechtel Corp.* (2002) 96 Cal.App.4th 966, 984–985 [117 Cal.Rptr.2d 647]; *California School Employees Assn. v. Personnel Commission, supra,* 30 Cal.App.3d at p. 249.) *Parker* recognized that "[t]he familiar rule requiring a plaintiff in a tort or contract action to mitigate damages embodies notions of fairness and socially responsible behavior which are fundamental to our jurisprudence." (*Parker,* at p. 185 (dis. opn. of Sullivan, Acting C. J.); accord, *McGinnis, supra,* 31 Cal.4th at p. 1043.)

In this case, the trial court allowed the jury to consider the evidence of plaintiff's retirement benefits on the issue of damages. It allowed the jury to determine whether to reduce her damages, if any, and the amount by which any damages would be reduced. No California case cited by the parties or found by us discusses the question whether the availability of retirement benefits may be considered in *mitigation* of damages sustained by a wrongfully terminated or demoted employee.

■ The trial court defined the question as one of relevance, and not an issue of the impact of the "collateral source rule." Simply stated, the collateral source rule provides that "if an injured party receives some compensation for his [or her] injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (*Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6 [84 Cal.Rptr. 173, 465 P.2d 61] (*Helfend*); accord, *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 551 [129 Cal.Rptr.3d 325, 257 P.3d 1130] (*Howell*).)[16] The collateral source rule operates to prevent a defendant from reducing a plaintiff's damages with evidence the plaintiff received compensation from a source independent of the defendant. "[T]he collateral source rule is well established in this state, and in fact California has long been described as a 'firm proponent of the "collateral source rule." ' (*Hrnjak v. Graymar, Inc.* (1971) 4 Cal.3d 725, 729 [94 Cal.Rptr. 623, 484 P.2d 599].) The rule 'operates both as a substantive rule of damages and as a rule of evidence.' [Citation.]" (*Rotolo Chevrolet v. Superior Court* (2003) 105 Cal.App.4th 242, 245 [129 Cal.Rptr.2d 283] (*Rotolo*); see *Howell, supra,* at p. 551.) "Because a collateral payment may not be used to reduce recoverable damages, evidence of such a payment is inadmissible for that purpose. Even if relevant on another issue (for example, to support a defense claim of malingering), under Evidence Code section 352 the probative value of a collateral payment must be 'carefully weigh[ed] . . . against the inevitable prejudicial impact such evidence is likely to have on the jury's deliberations.' (*Hrnjak v. Graymar, Inc.*[, *supra*,] 4 Cal.3d 725, 732 . . . .) Admission of evidence of collateral payments may be reversible error even if accompanied by a limiting instruction directing the jurors not to deduct the payments from their award of economic damages. (*Id.* at pp. 729, 734.)" (*Howell,* at p. 552.)

■ "[T]he doctrine also covers payments *such as pensions* paid to a plaintiff who, as a result of his injuries, can no longer work. Like insurance benefits, such payments are considered to have been secured by the plaintiff's efforts as part of his employment contract, and the tortfeasor is entitled to no credit for them. (See *McQuillan v. Southern Pacific Co.* (1974) 40 Cal.App.3d

---

[16] In *Howell, supra,* 52 Cal.4th 541, the California Supreme Court recently held that "an injured plaintiff whose medical expenses are paid through private insurance may recover as economic damages no more than the amounts paid by the plaintiff or his or her insurer for the medical services received or still owing at the time of trial." (*Id.* at p. 566.) In so holding, the court explicitly reaffirmed California's recognition of the collateral source rule. "[W]e in no way abrogate or modify the collateral source rule as it has been recognized in California; we merely conclude the negotiated rate differential—the discount medical providers offer the insurer—is not a benefit provided to the plaintiff in compensation for his or her injuries and therefore does not come within the rule." (*Ibid.*)

802 [115 Cal.Rptr. 418].)" (*Rotolo, supra,* 105 Cal.App.4th at p. 245, fn. omitted, italics added.) "With respect to pension benefits, the justification for the rule is that the plaintiff secured the benefits by his labors, and the fact that he may obtain a double recovery is not relevant. (See *Helfend, supra,* 2 Cal.3d at pp. 10–11.)" (*Rotolo,* at pp. 245–246, fn. 2.) Pension benefits are a commonly cited example of a collateral source that may not be used to decrease a plaintiff's recovery. (See *Helfend, supra,* 2 Cal.3d at pp. 13–14 [collateral source rule applicable "in tort cases in which the plaintiff has been compensated by an independent collateral source—such as insurance, *pension,* continued wages, or disability payments—for which he has actually or constructively . . . paid" (italics added, citations omitted)]; *Rotolo, supra,* 105 Cal.App.4th at p. 245 [same]; *Bencich v. Market St. Ry. Co.* (1938) 29 Cal.App.2d 641, 647–648 [85 P.2d 556] [injured employee's receipt of pension proceeds did not operate to reduce damages due to his lost earning capacity]; Rest.2d Torts, § 920A, com. c, p. 515 [listing Social Security and pension benefits as being subject to the collateral source rule]; Annot., Collateral source rule: receipt of public or private pension as affecting recovery against a tortfeasor (1961) 75 A.L.R.2d 885 [cases on receipt of public or private pensions as collateral sources]; Johns, Cal. Damages: Law and Proof (5th ed. 2011) Collateral Source Rules, §§ 1.65–1.69, pp. 1-86 to 1-88 (rel. 8-8/04) [listing disability retirement and pension benefits, among others, as collateral sources that do not reduce damages].)

Courts have recognized that barring consideration of payments from an outside source will often result in a double recovery for the plaintiff. "[T]hat a plaintiff may in fact receive as much, or more than he or she received prior to the injury, does not impact the collateral source rule." (*McKinney v. California Portland Cement Co.* (2002) 96 Cal.App.4th 1214, 1224 [117 Cal.Rptr.2d 849] (*McKinney*), citing *Hume v. Lacey* (1952) 112 Cal.App.2d 147, 151–152 [245 P.2d 672].) "It is an integral part of the rule that a plaintiff will be compensated for his or her loss in some fashion from the outside source. The rule is no different because the compensation comes from a pension benefit rather than an insurance policy." (*McKinney,* at p. 1224.)[17]

---

[17] Courts differ on the related question of whether a backpay award to a wrongfully discharged employee may be reduced by retirement or pension benefits the employee *actually receives from the employer* after discharge. (See Chin et al., Cal. Practice Guide: Employment Litigation, *supra,* ¶¶ 17:175 to 17:177, p. 17-25 (rev. # 1, 2010).) "One view is that because *the purpose is to restore the employee to the status quo,* pension benefits *should be deducted* from a backpay award, since plaintiff would not have received such payments had he or she not been discharged. [Citations.]" (Chin et al., Cal. Practice Guide: Employment Litigation, *supra,* ¶ 17:176, p. 17-25.) "Other courts *refuse* any deduction for payments from pension and retirement plans" reasoning the "[p]laintiff should not have to exhaust retirement benefits to which he or she was entitled when 'but for the wrongful termination (he or) she would have received regular wages.' [Citations.]" (*Id.,* ¶ 17:177.)

In addition to backpay, damages may include as "front pay" an award of the salary and benefits a wrongfully demoted or discharged plaintiff would have earned from employment

■ The court below viewed the question as one of relevancy and said it was not considering the impact of the collateral source rule. However, in explaining that it was allowing the evidence of plaintiff's eligibility for retirement benefits to be introduced, it relied upon a consideration commonly used in determining whether the collateral source rule should apply to allow deduction of governmental benefits from damages—whether the injured party received benefits wholly independent of the wrongdoer or from the defendant or a source identified with the defendant. (Chin et al., Cal. Practice Guide: Employment Litigation, *supra*, ¶¶ 17:180–17:183, pp. 17-25 to 17-26 (rev. # 1, 2010).) The court allowed evidence regarding the availability of plaintiff's retirement income, reasoning that because plaintiff's "pension benefits derived directly from her employment at College of Marin, they are available to her, they're relevant." The collateral source rule generally does *not* apply and consequently, damages are offset by the amount of benefit payments, when the benefit payment comes *from the employer.* (Chin et al., Cal. Practice Guide: Employment Litigation, *supra*, ¶ 17:182, p. 17-26; see *Helfend, supra,* 2 Cal.3d 1, 13–14 [collateral source rule applicable "in tort cases in which the plaintiff has been compensated by an *independent collateral source—such as* insurance, *pension,* continued wages, or disability payments—for which he had actually or constructively . . . paid" (italics added, citations omitted)].)

To be subject to the rule, the compensation must be "from a source wholly independent of the tortfeasor . . . ." (*Helfend, supra,* 2 Cal.3d 1, 6.) However, as *Helfend* explained, an independent collateral source is most often obtained as a result of the plaintiff's actual or constructive payment and planning. (*Id.* at p. 10.) The purpose of the rule is not served by allowing the defendant to escape liability for a wrong merely because the injured party was wise enough to provide for his or her retirement. Benefits received by a state employee from the California Public Employees' Retirement System (PERS)

after the trial. (Chin et al., Cal. Practice Guide: Employment Litigation, *supra*, ¶ 17:220, p. 17-32 (rev. # 1, 2010).) California courts have treated front pay as a damage issue for the trier of fact. (See *Id.,* ¶ 17:231, p. 17-34 (rev. # 1, 2010); *Cloud v. Casey* (1999) 76 Cal.App.4th 895, 910 [90 Cal.Rptr.2d 757] [FEHA (California Fair Employment and Housing Act; Gov. Code, § 12900 et seq.) discrimination action].) In federal courts, front pay is considered to be an equitable remedy determined by the court and not the jury, but the trial judge has considerable discretion to determine whether, and how much, front pay should be awarded. (Chin et al., Cal. Practice Guide: Employment Litigation, *supra*, ¶ 17:230, p. 17-34 (rev. # 1, 2010); *Mathieu v. Gopher News Co.* (8th Cir. 2001) 273 F.3d 769, 779 [judge did not abuse his discretion in awarding front pay in amount recommended by jury].) Front pay is measured by the employee's projected earnings and benefits over the period of time until he or she is likely to become reemployed or likely to retire, where reemployment is unlikely. (Chin et al., *supra*, ¶ 17:235, pp. 17-34 to 17-35 (rev. # 1, 2010).) The claimant's work and life expectancy are factors pertinent to the front pay determination. (*Id.,* ¶ 17:237, p. 17-35 (rev. # 1, 2010), citing *Anastasio v. Schering Corp.* (3d Cir. 1988 ) 838 F.2d 701, 709.)

have been held to be an independent collateral source, even where the state is the tortfeasor. (*McQuillan v. Southern Pacific Co., supra,* 40 Cal.App.3d 802 (*McQuillan*).)

In the action below, although plaintiff argued that evidence of her retirement benefits should be excluded, she did not specifically dispute the court's statement that her pension benefits derived directly from her employment at College of Marin. However, on appeal, relying upon *McQuillan, supra,* 40 Cal.App.3d 802, plaintiff argues that, like insurance benefits, the retirement pension here should have been excluded consistent with the "collateral source" rule. *McQuillan* held in a wrongful death action that the amount received by survivors of a public employee from PERS as a death benefit was analogous to pension and insurance payments made by sources independent of the defendant. Although the state was the decedent's employer and also a joint tortfeasor responsible for the decedent's death, the appellate court held that the collateral source rule applied and precluded reduction of the judgment by death benefits it paid. According to the Court of Appeal, "In the present case we must consider the State's relationship to McQuillan. The State was his employer, the provider and operator of a retirement system consisting of retirement compensation and death benefits payable to him as an employee of the State [citation] and it was a tortfeasor contributing to his death." (*Id.* at p. 807.) Both the members and the employer make contributions to the fund administered by PERS and the pension rights are earned by the employee and considered to be vested. (*Id.* at p. 808.) "Moreover, a state retirement system such as that involved in this case constitutes with other provisions the terms of the employee's contract of employment with the state agency by which he is employed. [Citations.] [¶] It is clear from the nature of the retirement system that the contributions by the State to the retirement fund were not contributions made by it as a tortfeasor but resulted from a contractual and statutory obligation completely outside the notions of tort liability. Rather, they fall within the ambit of the cases that hold pension and insurance payments to be collateral sources which are not intended to benefit a tortfeasor and which do not reduce his liability. [Citations.]" (*Ibid.*)[18]

---

[18] This analysis is consistent with the cases catalogued in the American Law Reports annotation on "receipt of public or private pension as collateral sources." (Annot., Collateral source rule: receipt of public or private pension as affecting recovery against a tortfeasor, *supra,* 75 A.L.R.2d 885.) "As a general rule, it has been held that the fact that a complainant receives, from a collateral source, payments which have some tendency to mitigate the consequences of the injury which he otherwise would have suffered as a result of the defendant's tort, may not be taken into consideration in assessing the damages which the defendant must pay. [¶] *This principle has been recognized in most of the cases in which a defendant claimed the right **to mitigate the damages** arising from a personal injury because the injured complainant was entitled to a retirement or disability pension, the courts holding that although in a sense the claimed damages for loss of future earnings had not actually been suffered, since the pension payments to some degree replaced such earnings, the defendant was*

Here, evidence was presented that plaintiff contributed to her combined PERS and STRS pension and that her pension was based on a formula taking into account, along with a service factor, her years of service and her highest annual salary level. As with the death benefit at issue in *McKinney, supra*, 96 Cal.App.4th 1214, this feature of the retirement benefit "makes it look much like an insurance policy." (*Id.* at p. 1227.) "[A] Public Employees' Retirement System pension benefit is ' "a derivative right, an element of the deceased's compensation earned by the employee by his performance of his duties. [Citations.]" [Citations.]' ([*McQuillan*,] at pp. 807–808.) The contributions to the pension plan resulted in a collateral source benefit wholly independent from the tortfeasor." (*McKinney*, at p. 1227.)

In *Monroe v. Oakland Unified School Dist.* (1981) 114 Cal.App.3d 804, 810–812 [170 Cal.Rptr. 867] (*Monroe*), this court followed *Billetter v. Posell* (1949) 94 Cal.App.2d 858, 860 [211 P.2d 621] (*Billetter*) in holding that unemployment insurance benefits are not deductable from damages in wrongful termination actions. (See *Mayer v. Multistate Legal Studies, Inc.* (1997) 52 Cal.App.4th 1428, 1436, fn. 3 [61 Cal.Rptr.2d 336].) *Monroe* relied in part on the operation of the unemployment compensation scheme, in which benefits depend on the length of employment and rate of pay and in which the available benefits were capable of being exhausted by the recipient. By wrongfully reducing the plaintiffs' earnings, the employer reduced the amount of benefits to which the plaintiffs were entitled and the plaintiffs were forced to prematurely exhaust future benefits. (*Monroe*, at p. 812.) *Monroe* stated that "the law of this state does not require the mitigation of damages by everything of value received during a period of wrongful unemployment. Rather, the rule of mitigation requires only the duty to seek other employment. [Citations.]" (*Id.* at p. 811.)

In *Mayer v. Multistate Legal Studies, Inc., supra*, 52 Cal.App.4th 1428 (*Mayer*), we reversed and remanded a judgment in a wrongful termination case, where the trial court found the plaintiff was precluded as a matter of law from recovering *any* lost earnings for the period during which he received disability benefits and where it found that the plaintiff did not adequately mitigate his damages following the first three months after his termination. The employee *conceded his disability benefits should be deducted from his contract damages in order to foreclose double recovery of his*

---

*not entitled to benefit from what the complainant received in this way from an independent source.* [¶] *This result has usually been reached* regardless of whether the pension was contributory or noncontributory, and, in most cases, *regardless of whether or not the defendant himself was paying the pension. . . ."* (*Id.* at pp. 885–886, italics and boldface added, fns. omitted.)

*economic damages.* (*Id.* at p. 1434.) In holding that the court erred in allowing a reduction in damages in an amount exceeding the disability benefits actually paid to the employee, we noted that California courts have held that general unemployment compensation benefits are *not* to be deducted from damages in wrongful termination actions. (*Id.* at p. 1436, fn. 3, citing *Billetter, supra,* 94 Cal.App.2d at p. 860 and *Monroe, supra,* 114 Cal.App.3d at pp. 810–812.) However, because the employee had conceded that his disability payments should be deducted from his damages, we did not consider whether there was an exact analogy between the two statutory schemes. We reasoned that to preclude any recovery of lost earnings during the period in which the plaintiff received disability benefits "would force future employees finding themselves in positions similar to this plaintiff to make an unacceptable election, i.e., accept benefits needed for survival in the present or pursue a more lucrative claim against the employer that may not come to fruition for several years. This unacceptable choice contravenes the policies underlying the Legislature's decision to make disability compensation available in the first place." (*Mayer,* at p. 1435.) Moreover, the defendant's wrongful conduct placed the plaintiff in a materially worse position when his illness struck, depriving him of the opportunity to even attempt to perform his duties during his treatments. (*Id.* at p. 1436.) The same could be said with respect to requiring a plaintiff who is eligible to retire, but does not wish to do so, to elect retirement sooner than the employee wishes, rather than pursuing a claim against the employer-wrongdoer that might not come to fruition for some years.

Had plaintiff actually retired and taken her retirement pension, we are convinced the trial court would have been required to exclude evidence of plaintiff's retirement benefits as a collateral source. In fact, the trial court *gave* the collateral source payment instruction in conformity with Government Code section 985 that: "You shall award damages in an amount that fully compensates plaintiff for damages in accordance with instructions from the court. You shall not speculate or consider any other possible sources of benefit the plaintiff may have received. After you have returned your verdict the court will make whatever adjustments are necessary in this regard."

It seems to us to make little sense to allow introduction into evidence of retirement benefits that plaintiff never received on the issue of mitigation where such evidence would have been precluded under the collateral source rule had she actually received the benefits. It appears the court viewed the issue as one of fact, akin to the question whether plaintiff made reasonable efforts to mitigate her damages by seeking comparable or substantially similar employment. As stated in *Parker,* "The controlling law is clear. The employer

must demonstrate the availability of comparable or substantially similar positions *before* projected earnings of alternative employment opportunities *not sought* by the discharged employee are properly considered. (*Parker, supra*, 3 Cal.3d at pp. 181–182; [citations].)" (*Candari, supra*, 193 Cal.App.4th 402, 411.) The district argues on appeal that the availability to plaintiff of retirement at an income (including Social Security) exceeding the amount she would have made in the dean position is a fortiori comparable or better employment. Whatever the merits of this contention (and we consider it doubtful), the court gave no instructions on mitigation of damages and never advised the jury that it should determine whether retirement was comparable or substantially similar to the dean position from which plaintiff had been discharged. Instead, the court admitted evidence relating to plaintiff's retirement eligibility and projected retirement benefits and invited the jury to decide whether and how to use that evidence in connection with its determination of damages, without providing the jury any guidance in doing so.

 We agree with the appellate court in *Griesser v. National Railroad Passenger Corp.* (2000) 2000 PA Super. 313 [761 A.2d 606], holding that pursuant to the collateral source rule, evidence of the employee's future retirement benefits (that he could retire with full pension benefits at age 60) was inadmissible under the federal Employers' Liability Act (45 U.S.C. § 51 et seq.) to show that he had an economic incentive to retire before age 65 because of the danger that the jury would use this evidence for the improper purpose of mitigating the plaintiff's damages or reducing the defendant's liability. According to *Greisser*: "We understand that future retirement benefits are not triggered by the injury; rather, they would have been awarded even if Appellant had not been injured. Moreover, future retirement benefits do not improperly suggest that the plaintiff is currently being compensated for his injury from another source. In these respects, the evidence at issue is not 'classic' collateral source evidence. [¶] On the other hand, there remains a significant danger that a jury will misuse and misinterpret evidence of early retirement benefits. For example, the jury could conclude that [defendant] was liable for lost wages to age 65 or 70, but then decline to award such damages because of the fortuitous existence of equivalent retirement benefits. Or, the jury could conclude that Appellant was entitled to benefits only to age 60 and was attempting to seek a double recovery of benefits after age 60. In short, this evidence distracts the jury from the issues in the case and has a strong likelihood of prejudicing the plaintiff." (761 A.2d at p. 612, boldface omitted.) The court concluded evidence of the employee's future retirement benefits was inadmissible to show that he had an economic incentive to retire before age 65, because of the danger that the jury would use this evidence for the improper purpose of mitigating the employee's damages or reducing Amtrak's liability. (*Id.* at pp. 612–613.)

## DISPOSITION

The judgment is reversed and the matter remanded for retrial in accordance with the views set forth herein. Plaintiff shall recover her costs on this appeal.

Haerle, J., and Lambden, J., concurred.

Respondents' petition for review by the Supreme Court was denied April 25, 2012, S200217.